# McPHAUL v. UNITED STATES.

No. 33. Argued October 13, 1960.—Decided November 14, 1960.

*Ernest Goodman* argued the cause and filed a brief for petitioner. *Geo. W. Crockett, Jr.* was with him on the petition.

*Daniel M. Friedman* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Yeagley, Kevin T. Maroney, George B. Searls* and *Lee B. Anderson.*

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

We here review petitioner's conviction under 2 U. S. C. § 192 [1] for willful failure to comply with a subpoena of the House of Representatives commanding him to produce certain records of the Civil Rights Congress before a Subcommittee of the House Committee on Un-American Activities. The principal question presented is whether the evidence justified the trial court's rulings that the records called for by the subpoena were in existence, subject to petitioner's control, and pertinent to the Committee's inquiry.

The relevant evidence was as follows. Having knowledge that the Civil Rights Congress had been declared a subversive organization by the Attorney General—indeed, having itself earlier found that organization to be a subversive one—and having reason to believe that petitioner

---

[1] "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

was its Executive Secretary,[2] the House Committee on Un-American Activities caused a subpoena of the House of Representatives to be issued and served upon petitioner commanding him to appear before its Committee on Un-American Activities, or a subcommittee thereof, at a stated time and place in Detroit, Michigan, on February 26, 1952, and there to produce "all records, correspondence and memoranda pertaining to the organization of, the affiliation with other organizations and all monies received or expended by the Civil Rights Congress . . . [and] then and there to testify touching matters of inquiry committed to said Committee . . . ."

Upon the opening of the hearings before the Subcommittee at Detroit on February 26, 1952, the chairman made a public statement, saying, among other things, that earlier Committee hearings had "disclosed a concentration of Communist effort in certain defense areas of the country," consisting in part of keeping "the national organization of the Communist Party and the international Communist movement fully advised of industrial potentialities" in such areas, and that "[t]here is no area of greater importance to the Nation as a whole, both in time of peace and in time of war, than the general area of Detroit," and he concluded with the statement that: "The purpose of this investigation is to determine first, whether there has been Communist activity in this vital defense area, and if so, the nature, extent, character and objects thereof."

Accompanied by counsel, petitioner appeared before the Subcommittee at the time and place commanded by the subpoena, and the following colloquy occurred:

"Mr. Wood [the chairman]: Mr. McPhaul, the committee has heretofore served upon you a sub-

[2] See note 4.

poena duces tecum, to produce certain records and documents. Are you prepared to respond to that subpoena?

.        .        .        .        .

"Mr. Wood: . . . Will you answer my question, Mr. McPhaul. Are you prepared to produce the documents and papers that have been called upon for you to produce under the subpoena?

"Mr. McPhaul: Mr. Wood, I refuse to answer this or any question which deals with the possession or custody of the books and records called for in the subpoena. I claim my privilege under the fifth amendment of the Constitution.

.        .        .        .        .

"Mr. Tavenner [Committee counsel]: I would like to ask the witness if he has any other reason for refusing to produce the documents called for in the subpoena?

.        .        .        .        .

"Mr. Wood: In order to complete the record, Mr. McPhaul is it in response to this subpoena that has just been read that you now decline, for the reason you have stated, to produce the documents and books and records therein called for?

"Mr. McPhaul: I have stated the reasons, for the record.

"Mr. Wood: Is it in response to this subpoena that you refuse to answer?

"Mr. McPhaul: That is my answer that I have just given.

"Mr. Wood: To this subpoena?

"Mr. McPhaul: To that subpoena; yes."

Petitioner was then sworn, and, after submitting a prepared statement and answering a few preliminary questions, the following occurred:

"Mr. TAVENNER: The question is as to whether or not you are refusing to produce the records directed to be produced under the subpoena?

"Mr. McPHAUL: My answer to that is, I refuse to answer this or any questions which deal with possession or custody of the books and records called for in this subpoena. I claim my privilege under the fifth amendment of the United States Constitution.

"Mr. TAVENNER: My question to you was not answered by that statement, in my judgment. My question was whether or not you are refusing to produce the records which you were directed to produce under this subpoena?

"Mr. McPHAUL: I have answered it in this statement.

"Mr. TAVENNER: No sir. You have stated that you refuse to answer any questions pertaining to them. I have not asked you a question that pertains to them. I have asked you to produce the records. Now, will you produce them?

"Mr. McPHAUL: I will not."

Following receipt of the Subcommittee's report of these occurrences, the House certified the matter to the United States Attorney for the Eastern District of Michigan for initiation of contempt proceedings against petitioner, and he was indicted on July 29, 1954. After denial of his motion to dismiss the indictment,[3] petitioner entered a

---

[3] Petitioner's motion to dismiss challenged the indictment on the grounds, among others, (1) that it failed to state "the relationship, if any, between the defendant and the Civil Rights Congress whose records defendant was required to produce," or that they "were subject to the control or in the custody of the defendant"; (2) that

plea of not guilty and the case was put to trial before a jury. The Government offered and there was received in evidence those portions of the transcript of the Detroit hearings which we have mentioned, various House documents authorizing the initiation of this proceeding, and a letter on the letterhead of the Civil Rights Congress, dated February 16, 1952, over petitioner's name, and what purported to be his signature, as Executive Secretary.[4]

Petitioner offered no evidence, but moved for a directed verdict of acquittal substantially on the grounds asserted in his motion to dismiss the indictment (see note 3) and on the further grounds that the Government had failed to adduce any evidence sufficient to show that the records called for by the subpoena were in existence and in petitioner's possession or control at the time he was served with the subpoena or that they were pertinent to the Subcommittee's inquiry. The motion was denied, and thereupon petitioner requested the court to charge the jury, in substance, that unless they found from the evidence and beyond a reasonable doubt that the records called for by the subpoena were in existence and in petitioner's custody or control at the time the subpoena was served upon him, they should find him not guilty. The court refused that

---

it failed to state facts showing "the inquiry [to be] within the purview of the" Subcommittee, "and the relevancy and materiality to [the] inquiry of the records called for in the subpoena"; and (3) that the scope of the subpoena violated "defendant's rights under the Fourth Amendment to the United States Constitution."

[4] The letter—taken from the Subcommittee's files—was on the letterhead of the Civil Rights Congress, dated February 16, 1952— just 10 days prior to the Detroit hearing—over petitioner's name, and what purported to be his signature, as Executive Secretary. Despite the identity of names and the rule that "identity of names is *prima facie* evidence of identity of persons," *Stebbins* v. *Duncan*, 108 U. S. 32, 47, the trial court, upon petitioner's objection, excluded the exhibit from consideration by the jury but received it for his own consideration in respect to the questions of law presented.

request and, instead, charged the jury not to consider "whether the records and documents designated in the subpoena were actually in existence or under the possession or control of the defendant, because if the defendant had legitimate reasons for failing to produce the said records, he should have stated his reasons for non-compliance with the subpoena when he appeared before the said subcommittee."

The jury found petitioner guilty, and he was fined the sum of $500 and sentenced to imprisonment for a period of nine months. The Court of Appeals affirmed, 272 F. 2d 627, and we granted certiorari, 362 U. S. 917.

Petitioner's principal contentions here are that there was no evidence showing that the records called for by the subpoena were in existence or, if it may be said that there was, that those records were in petitioner's possession or subject to his control, and the trial court therefore should have sustained his motion for a directed verdict of acquittal or, at the minimum, should have submitted those matters to the jury for resolution.

It is of course true that "[a] court will not imprison a witness for failure to produce documents which he does not have, unless he is responsible for their unavailability, cf. *Jurney* v. *MacCracken*, [294 U. S. 125], or is impeding justice by not explaining what happened to them, *United States* v. *Goldstein*, 105 F. 2d 150 (1939)," *United States* v. *Bryan*, 339 U. S. 323, 330–331. But, so far as the record shows, petitioner has never claimed— either before the Subcommittee, the District Court, or the Court of Appeals, and he does not claim here—that the records called for by the subpoena did not exist or that they were not in his possession or subject to his control. Rather, his claim, first raised at his contempt trial more than two years after his appearance before the Subcommittee, is that the Government failed to show that he could have produced the records before the Subcommittee,

notwithstanding he has never claimed he could not produce them.

We think the Court's decision in *United States* v. *Bryan,* 339 U. S. 323, is highly relevant to these questions.[5]   For it is as true here as it was there, that "if [petitioner] had legitimate reasons for failing to produce the records of the association, a decent respect for the House of Representatives, by whose authority the subpoenas issued, would have required that [he] state [his] reasons for noncompliance upon the return of the writ." *Id.,* at 332.   Such a statement would have given the Subcommittee an opportunity to avoid the blocking of its inquiry by taking other appropriate steps to obtain the records.   "To deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of its authority and an obstruction of its processes.   See *Bevan* v. *Krieger,* 289 U. S. 459, 464–465 (1933)."   His failure to make any such statement was "a patent evasion of the duty of one summoned to produce papers before a congressional committee [, and] cannot be condoned." *Id.,* at 333.

The Government's proof at the trial thus established a *prima facie* case of willful failure to comply with the subpoena.   The evidence of the Subcommittee's reasonable basis for believing that the petitioner could produce the records in question, coupled with the evidence of his failure even to suggest to the Subcommittee his inability to produce those records, clearly supported an inference that he could have produced them.   The burden then shifted to the petitioner to present some evidence to explain or justify his refusal.   *Morrison* v. *California,* 291 U. S. 82, 88–89.   But he elected not to present any evidence.   In these circumstances, there was no factual issue, respecting the existence of the records or his ability to produce them, for resolution by the jury.

---

[5] See also the companion case of *United States* v. *Fleischman,* 339 U. S. 349, which is equally relevant to these questions.

The Fifth Amendment did not excuse petitioner from producing the records of the Civil Rights Congress, for it is well settled that "[b]ooks and records kept 'in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination, even though production of the papers might tend to incriminate [their keeper] personally.' *United States* v. *White,* 322 U. S. 694, 699 (1944)." *Rogers* v. *United States,* 340 U. S. 367, 372. And see *Curcio* v. *United States,* 354 U. S. 118, 122–123. Similarly, there is no merit in petitioner's argument that he could not have advised the Subcommittee that he was unable to produce the records without thereby inviting other questions respecting the records and thus risking waiver of his privilege against self-incrimination. See *Curcio* v. *United States,* 354 U. S. 118. Nor does the rule of *Blau* v. *United States,* 340 U. S. 159, excuse one subpoenaed to produce records in a representative capacity, *United States* v. *White,* 322 U. S. 694, from asserting inability to produce the records if, at a later contempt trial for failure to produce the records, he expects to put the Government to proof on that matter.

Inasmuch as petitioner neither advised the Subcommittee that he was unable to produce the records nor attempted to introduce any evidence at his contempt trial of his inability to produce them, we hold that the trial court was justified in concluding and in charging the jury that the records called for by the subpoena were in existence and under petitioner's control at the time the subpoena was served upon him.

Petitioner next contends that the evidence was not sufficient to show that the records called for by the subpoena were pertinent to the inquiry. In the first place, petitioner made no objection to the subpoena before the Subcommittee on the ground of pertinency, see *Barenblatt* v. *United States,* 360 U. S. 109, 123, but we need not

rest decision on that score, for here "pertinency" was clearly shown. The stated purposes of the hearing were to determine "whether there has been Communist activity in this vital defense area [Detroit], and if so, the nature, extent, character and objects thereof." Earlier Subcommittee hearings had "disclosed a concentration of Communist effort in certain defense areas of the country," consisting in part of keeping "the national organization of the Communist Party and the international Communist movement fully advised of industrial potentialities" in such areas, and the Subcommittee also had reason to believe that the Civil Rights Congress was being used for subversive purposes. The subpoena called for "all records, correspondence and memoranda" of the Civil Rights Congress relating to three specified subjects: (1) The "organization of" the group, (2) its "affiliation with other organizations," and (3) "all monies received or expended by [it]." It would seem clear enough that the auspices under which the Civil Rights Congress was organized, the identity and extent of its affiliations, the source of its funds and to whom distributed would be prime considerations in determining whether the organization was being used by the Communists in the Detroit area. If the Civil Rights Congress was affiliated with known Communist organizations, or if its funds were received from such organizations or were used to support Communist activities in the Detroit area, those facts, it is reasonable to suppose, would be shown by the records called for by the subpoena, and those facts would be highly pertinent to the Subcommittee's inquiry. It thus appears that the records called for by the subpoena were not "plainly incompetent or irrelevant to any lawful purpose [of the Subcommittee] in the discharge of [its] duties," *Endicott Johnson Corp.* v. *Perkins,* 317 U. S. 501, 509, but, on the contrary, were reasonably "relevant to the

inquiry," *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186, 209.

Finally, petitioner contends that the subpoena was so broad as to constitute an unreasonable search and seizure in violation of the Fourth Amendment of the Constitution. "[A]dequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry," *Oklahoma Press Publishing Co.* v. *Walling, supra,* at 209. The Subcommittee's inquiry here was a relatively broad one—whether "there has been Communist activity in this vital defense area [Detroit], and if so, the nature, extent, character and objects thereof"—and the permissible scope of materials that could reasonably be sought was necessarily equally broad.

It is not reasonable to suppose that the Subcommittee knew precisely what books and records were kept by the Civil Rights Congress, and therefore the subpoena could only "specif[y] . . . with reasonable particularity, the subjects to which the documents . . . relate," *Brown* v. *United States,* 276 U. S. 134, 143. The call of the subpoena for "all records, correspondence and memoranda" of the Civil Rights Congress relating to the three specified subjects describes them "with all of the particularity the nature of the inquiry and the [Subcommittee's] situation would permit," *Oklahoma Press Publishing Co.* v. *Walling, supra,* at 210, n. 48. "[T]he description contained in the subpoena was sufficient to enable [petitioner] to know what particular documents were required and to select them accordingly," *Brown* v. *United States, supra,* at 143. If petitioner was in doubt as to what records were required by the subpoena, or found it unduly burdensome, or found it to call for records unrelated to the inquiry, he could and should have so advised the Subcommittee, where the defect, if any, "could easily have been remedied," *United States* v. *Bryan, supra,* at 333. This subpoena was

not more sweeping than those sustained against challenges of undue breadth in *Endicott Johnson Corp.* v. *Perkins,* 317 U. S. 501, and *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186.

Under these circumstances, we cannot say that the breadth of the subpoena was such as to violate the Fourth Amendment.

*Affirmed.*

Dissenting opinion of MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE BRENNAN concur, announced by MR. JUSTICE BLACK.

Today's decision marks such a departure from the accepted procedure designed to protect accused people from public passion and overbearing officials that I dissent.

The Act under which petitioner goes to prison permits conviction only if he "willfully makes default" as a witness before a congressional Committee. 2 U. S. C. § 192. The subpoena commanded him to produce the records of "the Civil Rights Congress" at a given time and place. But it did not name petitioner as officer, agent, or member of "the Civil Rights Congress." The record contains no word of evidence to show (1) that petitioner was an officer, agent, or member of the Civil Rights Congress, or (2) that petitioner was in possession of, or was a custodian of, any of the records of "the Civil Rights Congress." The congressional Committee made no effort to establish these facts. Neither did the prosecutor when this criminal proceeding came to trial. The only evidence, if it can be called such, is the refusal or failure of the petitioner to deny those facts.[1] The District Court charged the jury

---

[1] The respondent claims that the Committee, if not the court, had a "reasonable basis for believing that petitioner could produce the records." That basis turns out to be a letter in the Committee files which the respondent made no attempt to link up with petitioner and which, for that reason, was never admitted into evidence.

that the failure of the prosecution to establish those facts was immaterial for the following reason:

"If you find from the evidence in this case, and beyond a reasonable doubt, that the defendant appeared before the said subcommittee, and then refused or failed to make any explanation with respect to the existence of the records designated in the subpoena, or with respect to whether or not such records were under his possession or control, I charge you that you may not consider the questions of whether the records and documents designated in the subpoena were actually in existence or under the possession or control of the defendant, because if the defendant had legitimate reasons for failing to produce the said records, he should have stated his reasons for non-compliance with the subpoena when he appeared before the said subcommittee.

"I also charge you that the defendant is not excused from compliance with or producing the records designated in the subpoena merely because he is not designated as an officer or agent of the Civil Rights Congress therein; and neither is the defendant excused from such compliance with the said subpoena merely because of any lack of proof of any connection between the defendant and the Civil Rights Congress."

This theory, now sustained by the Court, permits conviction without any evidence of any "willful" default.

The presumption of innocence, deep in our criminal law, has been one of our most important safeguards against oppression. So far as I can find, this is the first instance where we have dispensed with it. We do so today by shifting the burden to a witness to show that he is not an officer or agent of the organization in question and that he is not able to produce the documents, without requiring

any proof whatsoever by the prosecution that connects the defendant either with the organization or with the documents. Reliance is placed on *United States* v. *Bryan,* 339 U. S. 323. With all deference, that case is irrelevant because there the witness concededly was "the executive secretary" of the organization being investigated and had "custody of its records." *Id.,* 324. The issue in the case concerned the authority of the Committee to make the demand, authority challenged, at the trial but not before the Committee, because no quorum of the Committee was present when the witness made default. In *United States* v. *Fleischman,* 339 U. S. 349, there was also evidence that the defendant had power to cause the documents to be produced. *Id.,* 353–354. In those situations the prosecution proves enough when it establishes custody or power to control. *Id.,* 361–363. As respects the shift of the burden of going forward in a criminal prosecution to the defendant (*Morrison* v. *California,* 291 U. S. 82, 88, 90–91), Mr. Justice Cardozo said, by way of dictum, "For a transfer of the burden, experience must teach that the evidence held to be inculpatory has at least a sinister significance . . . or if this at times be lacking, there must be in any event a manifest disparity in convenience of proof and opportunity for knowledge . . . ." *Id.,* 90–91. Whatever may be the reach of that dictum, it was not adequate to sustain a conviction in that case and is inadequate here. That case involved a charge of conspiracy to violate the alien land law of California. A citizen, charged as coconspirator, was convicted on a presumption that he knew of the disqualification of his co-conspirator alleged to be an alien. The holding of the Court was that invocation of the presumption against the citizen denied him due process. *Id.,* 93. The alien was not a conspirator, "however guilty his own state of mind," unless the citizen "shared in the guilty knowledge and design." Therefore,

said Mr. Justice Cardozo, "The joinder was something to be proved, for it was of the essence of the crime." *Id.,* 93. That ruling rests on the presumption of innocence that is never overcome unless the prosecution introduces some competent evidence implicating the accused in the criminal act that is charged.[2] Here the crime is "willful" default in the production of records of "the Civil Rights Congress." There can be no "willful" default unless this petitioner is shown to have (1) *some* connection with that organization and (2) *some* custody or control of its records. Simple questions by the Committee might have produced the necessary answers. It is hornbook law that they should have been asked.[3] Yet they were not; and without the foundation which they might have laid, the present prosecution has no starting point unless we are to throw procedural requirements to the winds.

Failure of a defendant to explain why he does not produce documents may be sufficient under the cases, where it has first been shown that he has a connection with them. See *United States* v. *Fleischman, supra,* 360–363; *Nilva* v. *United States,* 352 U. S. 385, 392. But failure to explain, where no proof of the defendant's connection with the documents is shown, is like taking his action in standing mute as a confession of guilt. Once that was the rule. See *In re Smith,* 13 F. 25, 26–27; Beale, Criminal Plead-

---

[2] The assaults on this presumption have been vigorous and a few lower courts have succumbed as Goldstein, *The State and the Accused: Balance of Advantage in Criminal Procedure,* 69 Yale L. J. 1149, shows.

[3] Counsel for the Committee repeatedly asked petitioner to comply with the subpoena, but only once did he venture near the question of petitioner's power to comply. In the context of petitioner's invocation of his privilege against self-incrimination, Mr. Tavenner asked "if [petitioner] has any other reason for refusing to produce the documents called for." Again, the assumption is that the mere issue of the subpoena without more casts on the witness the burden of explaining non-compliance.

ing and Practice (1899), p. 52. Once it was the rule that a man who refused to take an oath and answer in criminal proceedings was held in contempt. *Trial of Lilburn,* 3 How. St. Tr. 1315. See Maguire, Attack of the Common Lawyers on the Oath *Ex officio* as Administered in the Ecclesiastical Courts in England, Essays in History and Political Theory (1936), c. VII, p. 215.

Today we take a step backward. We allow a man to go to prison for doing no more, so far as this record reveals, than challenging the right of a Committee to ask him to produce documents. The Congress had the right to get these documents from someone. But, when it comes to criminal prosecutions, the Government must turn square corners. If Congress desires to have the judiciary adjudge a man guilty for failure to produce documents, the prosecution should be required to prove that the man whom we send to prison had the power to produce them.