**UNITED STATES of America, Plaintiff,**

v.

**Harry N. POLLOCK, Emily Shoffey, and Jack Sobol, Defendants.**

**Cr. No. 5787.**

United States District Court
W. D. Arkansas,
Fort Smith Division.
Jan. 26, 1962.

Charles M. Conway, U. S. Atty., Fort Smith, Ark., K. William O'Connor, Sp. Atty., Tax Div., Dept. of Justice, Washington, D. C., for plaintiff.

Bernard J. Long, Washington, D. C., Bruce H. Shaw, Fort Smith, Ark., for defendants.

**544**

JOHN E. MILLER, Chief Judge.

The ultimate question to be determined is whether the defendants are guilty of criminal contempt in failing to comply with the order of this court of January 10, 1962, directing them to deliver to the United States Attorney, as custodian for the use of the grand jury, on or before 5 o'clock, Wednesday, January 17, 1962, the records, documents and papers enumerated in paragraphs 1 through 6, both inclusive, in the subpoenas which were served on them on January 5, 1962.

A grand jury for the Western District of Arkansas was impaneled on January 8, 1962. Prior to the convening and impanelment of the grand jury, the United States Attorney and two special attorneys from the Tax Division of the United States Department of Justice had caused subpoenas duces tecum to be issued and served upon the defendants requiring them to produce for use by the grand jury the following records:

"1. All petty cash vouchers for the General Office Account of Pollock Stores Company, Inc., Talihina, Oklahoma, with General Offices at 823 Garrison Avenue, Forth Smith, Arkansas, for fiscal years ending January 31, 1956, through January 31, 1958.

"2. All General Office Accounts Receivable Ledger Sheets of Pollock Stores Company, Inc., Talihina, Oklahoma, with General Offices at 823 Garrison Avenue, Fort Smith, Arkansas, for fiscal years ending January 31, 1956, through January 31, 1958.

"3. All General Office Accounts Payable Ledger Sheets of Pollock Stores Company, Inc., Talihina, Oklahoma, with General Offices at 823 Garrison Avenue, Fort Smith, Arkansas, for fiscal years ending January 31, 1956, through January 31, 1958.

"4. All Main Cashier's Reports of Daily Cash Receipts, and all monthly summaries thereof (entitled 'G.O. Cash Receipts') of Pollock Stores Company, Inc., Talihina, Oklahoma, with General Offices at 823 Garrison Avenue, Fort Smith, Arkansas, for the period commencing February 1, 1955, and ending July 31, 1958, both dates inclusive.

"5. All Daily Activity Reports of Arcade Furniture Store (also known as store #20), and all other reports and records of Arcade Furniture Store (also known as store #20), showing sales, receipts on accounts, cash sales, and all deposit slips of this branch of Pollock Stores Company, Inc., Talihina, Oklahoma, with General Offices at 823 Garrison Avenue, Fort Smith, Arkansas, for fiscal years ending January 31, 1956, through January 31, 1958.

"6. All Purchase Journals showing the purchases of all branches of Pollock Stores Company, Inc., Talihina, Oklahoma, with General Offices at 823 Garrison Avenue, Fort Smith, Arkansas, for fiscal years ending January 31, 1956, through January 31, 1958."

The grand jury was engaged in conducting an investigation of the income tax liability of Pollock Stores Company, Inc., the defendant, Harry N. Pollock, and certain other persons. On January 10, 1962, the grand jury reported in open court that the defendants had appeared in response to the subpoenas but had stated that the records called for by the subpoenas were neither in their possession or available, and had refused to answer as to the location of the subpoenaed records.

Following the failure of the defendants to produce the records in accordance with the order of the court, the plaintiff on January 18, 1962, filed its petition asking the court to issue a show-cause order requiring the defendants to appear and show cause, if any there be, why they should not be held in criminal contempt of the court.

On the same date the court issued its order to show cause. At the time such order was issued the defendants were

in court with their attorneys and had filed a response to the petition of the plaintiff asking that a show-cause order be issued.

The order was addressed to the defendants and recited that pursuant to Rule 42 (b), Fed.R.Crim.P., 18 U.S.C.A. "you are hereby ordered to appear at 9:00 o'clock a. m. on the 19th day of January, 1962, before this court at Fort Smith, Arkansas, and show cause, if any you have, why you should not be held in criminal contempt for obstructing the administration of justice," by failing to comply with the order of the court entered January 10, 1962.

On the next day, January 19, 1962, at the hearing on the question presented by the show-cause order, the parties stipulated:

"The defendants and each of them failed to deliver records itemized in subpoenas served on them on January 5, 1962 to the United States Attorney for the Western District of Arkansas on or before 5 o'clock p. m. Wednesday, January 17, 1962, as directed by Order of this Court entered and served upon the defendants January 10, 1962.

"That Harry N. Pollock, Emily Shoffey, and Jack Sobol are and have been respectively since February 1, 1955, President, Secretary and Comptroller of Pollock Stores Company, Inc., Talihina, Oklahoma.

"That Pollock Stores Company, Inc., Talihina, Oklahoma, is and has been since February 1, 1955, a Corporation chartered under the laws of the State of Oklahoma and authorized to do business in the State of Arkansas."

The defendants filed a response to the petition of the plaintiff for the issuance of the show-cause order, in which response they alleged that they had advised the grand jury on January 10, 1962, of their inability to produce said records and accordingly they were for that reason unable to produce the subpoenaed records as ordered by this court on January 10, 1962.

(Attached to the response was an affidavit of each of the defendants, but since the affidavits were not introduced in evidence at the hearing, neither the affidavits or the statements contained therein are being considered by the court.)

The defendants did not testify nor introduce any witnesses, but the plaintiff introduced five witnesses in an effort to prove that the records, documents and papers subpoenaed were in existence and that the defendants should be compelled to produce them for examination by the grand jury. The facts testified to by the witnesses are not disputed, but it is the inferences and conclusions that may be drawn therefrom which cause the difficulty.

As stipulated, the defendants are officers of Pollock Stores Company, Inc., Talihina, Oklahoma, and have been officers since the organization of the corporation in 1955. It is engaged in the operation of several stores.

Prior to July 1, 1958, a Mr. Kenneth B. Coger, Special Agent, Internal Revenue Service, was assigned to investigate the tax liability, if any, of the corporation and the defendants. He first contacted Harry N. Pollock on July 1, 1958, and worked in the office of the corporation during the early part of that month. After working in the office a few days, it was agreed by the defendants and the certified public accountant of the corporation with the Special Agent that the records and files which he desired to examine would be delivered to the office of the accountant located in the First National Bank of Fort Smith, Arkansas. Accordingly, all the records which the Special Agent requested at that time were delivered to the agreed place. It developed that the accountant, Douglas Walker & Co., did not have sufficient office space to house the records, and either the accountant or the defendants rented two additional rooms adjoining the office of the accountant where the records were stored. At no time was a list of the records that were delivered introduced in evidence, but apparently the Special Agent was not entirely satisfied, and on

September 1, 1959, he issued and served a subpoena for the defendant, Emily Shoffey, under the authority of 26 U.S. C. § 7602, summoning her to appear before him on September 17, 1959, and to produce for examination the following documents:

"1. General Office petty cash vouchers for fiscal years ending January 31, 1956 thru January 31, 1959, inclusive.

"2. General Office accounts receivable for fiscal years ending January 31, 1956 thru January 31, 1959, inclusive.

"3. Arcade Furniture Store, Fort Smith, Arkansas, All daily sales activity reports, including copies of deposit tickets for fiscal years ending January 31, 1956 thru January 31, 1959, inclusive.

"4. All work papers and supporting documents relating to bonus payments other than cancelled checks for fiscal years ending January 31, 1956 thru January 31, 1959.

"5. All records of memorandum charges to Harry N. Pollock paid by his personal check on First National Bank, dated January 30, 1957, for $5,129.89.

"6. The original lease agreements between Pollock Stores Company, Inc., and the following lessee: (1) Hazel Beauty Clinic, Hazel Reynolds, (2) James L. Jacobs Liquor Store, (3) Stuart Wholesale Electric Co., M. E. Stuart, and any other lease agreements in effect during the above period."

On December 10, 1959, he issued and served a similar subpoena on the defendant, Jack Sobol, summoning him to appear on December 29, 1959, and produce for examination the following books, records and papers:

"1. General office petty cash records, including vouchers, Pollock Stores Co., Inc., for period February 1, 1955, thru January 31, 1958.

"2. General office accounts and notes receivable, including memo charges, Pollock Stores Co., Inc., for period February 1, 1955, thru January 31, 1958.

"3. All daily sales activity reports Arcade Furniture Store, including copies of deposit tickets, for period beginning February 1, 1955, thru July 31, 1958.

"4. All work papers and supporting documents relating to bonus payments by Pollock Stores Co., Inc., other than canceled checks, for period beginning February 1, 1955, thru January 31, 1958.

"5. Purchase invoice register for period February 1, 1955, thru January 31, 1959."

On January 29, 1960, the Special Agent issued and served upon the defendant, Harry N. Pollock, a similar subpoena, summoning him to appear on February 11, 1960, and to produce for examination the following books, records and papers:

"1. All general office petty cash records, including vouchers and paid invoices for the period February 1, 1954 through January 31, 1959.

"2. All ledger sheets and supporting documents relating to the general office accounts and notes receivable, including memo charges, work papers, spreads, etc. for the period February 1, 1954 through January 31, 1958.

"3. All daily sales activity reports of Aracde Furniture Stores, Fort Smith, Arkansas, together with copies of all bank deposit tickets of Arcade Furniture Store for the period February 1, 1954 through July 31, 1958.

"4. All working papers and supporting documents (other than cancelled checks) relating to bonus payments made by Pollock Stores Co., Inc., for the period beginning February 1, 1954, and ending January 31, 1958.

"5. All books or original entry, supporting documents, working papers and records relating to pur-

chases and purchase returns and allowances of Pollock Stores Co., Inc., for the period February 1, 1954 through January 31, 1959.

"6. All supporting documents, work sheets, spreads, and memoranda relating to bank deposits of general office cash receipts as reflected in general journal of Pollock Stores Co., Inc., for the period February 1, 1954, through January 31, 1959."

The defendants appeared in response to the summonses on the dates therein specified accompanied by their attorney, Mr. Bernard J. Long. The Special Agent advised each of the defendants that "it is my duty to advise you that under the Constitution of the United States you have the right to refuse to answer any questions or make any statement which may tend to incriminate you under the laws of the United States and to inform you that anything you say or any evidence which you produce at this hearing may be used against you in any proceeding, criminal or otherwise, which may hereafter be undertaken by the United States." Following the statement made by the Special Agent to Harry N. Pollock, his attorney made the following statement to the Special Agent:

"As counsel for Mr. Pollock, I have advised him that under the law and in response to the summons that you have issued to him dated January 29, 1960, he must produce every document which you have subpoenaed and which is available to him, except to the extent as such documents that may have been supplied to you and are now in your possession. I have also advised him that under the Constitution of the United States he may decline to answer any question which you may put to him which may tend to incriminate him. I have also advised him that in the circumstances of this investigation it is my opinion that any question which you may ask him may tend to incriminate him. Under the circumstances, I believe that he will follow the advice which I have given to him as his counsel."

Likewise, the attorney for the other defendants made a similar statement for each of them when they appeared before the Special Agent.

Notwithstanding the statement of the attorney for the defendants, the Special Agent proceeded to interrogate each of them as to whether they had delivered all the records called for in the individual summons, where were the records then, in whose possession were the records, and other similar questions. Each of the defendants declined to answer the questions so propounded and invoked the protection of the Fifth Amendment.

The Agent testified that about January 21, 1960, he saw some of the records covered by the subpoenas in the possession of the corporation, but he apparently made no effort to obtain any additional records through administrative processes, notwithstanding he testified that he knew that a portion which had been subpoenaed were in existence at that time. He did not apply to the Judge of the United States District Court or to the United States Commissioner for the District for an attachment against any one of the defendants for contempt, or for an order to compel the defendants or any one of them to deliver the books, records and papers in accordance with the administrative subpoenas as provided in 26 U.S.C. § 7604.

Apparently the Special Agent was satisfied with the investigation, and he and another Revenue Agent, A. L. McNew, proceeded to fix a tax liability in a substantial amount for the defendant, Harry N. Pollock, and the corporation.

The plaintiff also introduced the Assistant Office Manager of the corporation, the Assistant Receiving Clerk at the Arcade Furniture Store, the Clerical Analyst, and the Expense Clerk of the corporation, but none of the witnesses knew whether the records, documents and papers called for in the grand jury subpoena were in existence on January 5, 1962; and testified that in the usual course of business of the corporation such records

were kept by them until the end of the fiscal year and at that time they were placed in a box or other container and delivered to the office of the Secretary of the corporation; that the records so delivered were not kept in the office of the Secretary but were removed therefrom in order to provide room for records to be compiled during the current year.

As heretofore stated, the grand jury subpoena served on each of the defendants was a subpoena duces tecum and not a subpoena ad testificandum. However, upon the appearance of each of the defendants before the grand jury, the special representative of the plaintiff undertook to interrogate each of them as to whether he or she had complied with the subpoena by delivering the books, records and papers therein listed, why he or she had not delivered them, and other similar questions. Each of the defendants invoked the protection of the Fifth Amendment, and each read to the grand jury a statement outlining his or her position and contention. The statement made by the defendant, Harry N. Pollock, is as follows:

"My counsel has advised me that under the laws and in response to subpoena I must produce every document which has been subpoenaed and which is available to me. The records which are the subject of the Grand Jury subpoena dated January 5, 1962, which was served on me are neither in my possession nor available to me. For about three and one-half years there has been conducted an investigation by the Internal Revenue Service for the purpose of attempting to establish that the Pollock Stores Company, Incorporated, and related corporations and officers and employees of the corporation, including myself, have violated and participated in the violation of the criminal income tax laws of the United States. During this investigation it has been established that I am an officer and employee of one or more of the corporations which have been under investigation. The investigation as conducted and the present inquiry necessarily leads to an investigation of the activities of officers and employees, including me. I feel that this three and one-half years of investigation and questioning have become unreasonable and that I am now being persecuted. I have been advised by my counsel that I may decline to answer any questions that may be put to me which may tend to incriminate me. My counsel has advised me that it is his opinion and it is also my opinion that under the present circumstances that any question that may be asked me may tend to incriminate me."

The transcript of the proceeding before the grand jury discloses that at the conclusion of the statement made by Mr. Pollock, the following occurred:

"Q. You stated that these documents were neither in your possession or available to you. When did they cease to be available to you or in your possession sir?

"A. I decline to answer on the grounds that it might tend to incriminate me.

"Q. Were they ever in your possession, sir?

"A. I decline to answer on the grounds that it might tend to incriminate me.

"Q. Are you president of the Pollock Stores Corporation?

"A. I am.

"Q. How long have you been so engaged, sir?

"A. Oh, I've been with the company since I was about fourteen years old.

"Q. At least since 1950, you have been President of the Pollock Stores Company, a corporation?

"A. Longer than that.

"Q. Pollock Stores Company, Inc.

"A. I founded the little company down at Talihina, Oklahoma when I was fourteen years old.

"Q. Now the records which have been requested on Grand Jury subpoena No. 1, a copy of which you have in your possession, are designated as records of the Pollock Stores Company of Talihina, Oklahoma. Are you familiar with the records of Pollock Stores Company?

"A. I decline to answer on the grounds that it might tend to incriminate me.

"THE FOREMAN: Any further questions?

"MR. O'CONNOR: I have no further question of the witness, Mr. Foreman."

The transcript further shows that the same procedure was followed with each of the other defendants when he or she appeared in response to the subpoena.

In Nilva v. United States, 352 U.S. 385, at page 392, 77 S.Ct. 431, at page 435, 1 L.Ed.2d 415, the court said:

"This reduces the case to the charge that petitioner wilfully disobeyed the court's order to produce certain corporate records required by subpoena No. 160. On that issue, it is settled that a criminal contempt is committed by one who, in response to a subpoena calling for corporation or association records, refuses to surrender them when they are in existence and within his control. United States v. Fleischman, 339 U. S. 349, 70 S.Ct. 739, 94 L.Ed. 906; United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542; Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771; and see United States v. Patterson, 2 Cir., 219 F.2d 659."

In Curcio v. United States, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225, the issue was whether the custodian of a union's books and records may, on the ground of his Fifth Amendment privilege against self-incrimination, refuse to answer questions asked by a federal grand jury as to the whereabouts of such books and records which he has not produced pursuant to a subpoena.

He had testified that he was secretary-treasurer of the union and that it had books and records, but they were not then in his possession. He refused, on the ground of self-incrimination, to answer any questions pertaining to the whereabouts, or who had possession of the books and records he had been ordered to produce. The District Court directed the petitioner to answer 15 questions pertaining to the whereabouts of the books and records and that his claim of privilege was improper because he had not made a sufficient showing that his answer might incriminate him. He was summarily adjudged guilty of criminal contempt and sentenced.

In the District Court and the United States Court of Appeals for the Second Circuit, the Government contended that the petitioner had not made a sufficient showing that answering the 15 questions might tend to incriminate him, but in the Supreme Court the Government abandoned that contention, and stated:

"We make no claim that, if petitioner's personal privilege did apply to questions concerning the union records, he failed to make an adequate showing of possible incrimination."

On page 122 of 354 U.S., on page 1148 of 77 S.Ct., the court said:

"It is settled that a corporation is not protected by the constitutional privilege against self-incrimination. A corporate officer may not withhold testimony or documents on the ground that his corporation would be incriminated. Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652. Nor may the custodian of corporate books or records withhold them on the ground that he personally might be incriminated by their production. Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771; Essgee Co. [of China] v. United States, 262 U.S. 151, 43 S.Ct. 514, 67 L.Ed. 917. Even after the dissolution of a corporation and the transfer of its books to individual stockholders, the transferees may not

invoke their privilege with respect to the former corporate records. Grant v. United States, 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423; Wheeler v. United States, 226 U.S. 478, 33 S. Ct. 158, 57 L.Ed. 309. The foregoing cases stand for the principle that the books and records of corporations cannot be insulated from reasonable demands of governmental authorities by a claim of personal privilege on the part of their custodian."

Beginning on page 123 of 354 U.S., on page 1149 of 77 S.Ct., the court said:

"The Government now contends that the representative duty which required the production of union records in the White case requires the giving of oral testimony by the custodian in this case. From the fact that the custodian has no privilege with respect to the union books in his possession, the Government reasons that he also has no privilege with respect to questions seeking to ascertain the whereabouts of books and records which have been subpoenaed but not produced. In other words, when the custodian fails to produce the books, he must, according to the Government, explain or account under oath for their nonproduction, even though to do so may tend to incriminate him.

"The Fifth Amendment suggests no such exception. It guarantees that 'No person * * * shall be compelled in any criminal case to be a witness against himself * * *.' A custodian, by assuming the duties of his office, undertakes the obligation to produce the books of which he is custodian in response to a rightful exercise of the State's visitorial powers. But he cannot lawfully be compelled, in the absence of a grant of adequate immunity from prosecution, to condemn himself by his own oral testimony."

At page 125 of 354 U.S., on page 1150 of 77 S.Ct., the court said:

"United States v. Austin-Bagley Corp., 2 Cir., 31 F.2d 229, and cases following it are relied upon by the Government. Those cases, holding that a corporate officer who has been required by subpoena to produce corporate documents may also be required, by oral testimony, to identify them, are distinguishable and we need not pass on their validity. The custodian's act of producing books or records in response to a subpoena duces tecum is itself a representation that the documents produced are those demanded by the subpoena. Requiring the custodian to identify or authenticate the documents for admission in evidence merely makes explicit what is implicit in the production itself. The custodian is subjected to little, if any, further danger of incrimination. However, in the instant case, the Government is seeking to compel the custodian to do more than identify documents already produced. It seeks to compel him to disclose, by his oral testimony, the whereabouts of books and records which he has failed to produce. It even seeks to make the custodian name the persons in whose possession the missing books may be found. Answers to such questions are more than 'auxiliary to the production' of unprivileged corporate or association records."

And on page 128 of 354 U.S., on page 1151 of 77 S.Ct., the court said:

" * * * The compulsory production of corporate or association records by their custodian is readily justifiable, even though the custodian protests against it for personal reasons, because he does not own the records and has no legally cognizable interest in them. However, forcing the custodian to testify orally as to the whereabouts of nonproduced records requires him to disclose the contents of his own mind. He might be compelled to convict himself out of his own mouth. That is contrary to

the spirit and letter of the Fifth Amendment.

"Accordingly, the judgment of the Court of Appeals is reversed and the case is remanded to the District Court with instructions to enter a judgment of acquittal."

In McPhaul v. United States, 364 U.S. 372, 81 S.Ct. 138, 5 L.Ed.2d 136, the petitioner's principal contentions were that there was no evidence showing that the records called for by the subpoena were in existence or, if it may be said that there was such evidence, that those records were in petitioner's possession or subject to his control, and the trial court should have sustained his motion for a directed verdict of acquittal, or, at the minimum, should have submitted those matters to the jury for resolution.

The court, after reviewing the testimony introduced at the trial and the entire record, found that the records were in existence, and since the petitioner was the Executive Secretary, the records were deemed to be in his possession and therefore concluded, at page 379 of 364 U.S., at page 143 of 81 S.Ct., that under these circumstances, "there was no factual issue, respecting the existence of the records or his ability to produce them, for resolution by the jury."

In the instant case each of the defendants testified before the grand jury:

"The records which are the subject of the Grand Jury subpoena dated January 5, 1962, which was served on me are neither in my possession nor available to me."

The grand jury subpoenas called for production of documents for the fiscal years ending January 31, 1956, through January 31, 1958.

It will be recalled that the defendant, Emily Shoffey, was required by the administrative subpoena to appear before the Special Agent on September 17, 1959; that the defendant, Jack Sobol, was required to appear before the same Agent on December 29, 1959, and the defendant, Pollock, was required to appear before the same Agent on February 11, 1960. The administrative subpoena described the books, records and papers which each witness was summoned to produce, and in view of the Special Agent's testimony that he saw some of the records then subpoenaed in the possession of the corporation on or about January 21, 1960, it is indeed strange that he did not follow the usual procedure then available to compel the production of all the records that had been listed in the administrative subpoenas.

The court does not believe that the Special Agent saw any of the records described in the grand jury subpoenas in the possession of the corporation on or about January 21, 1960, since all of the other witnesses testified that such records as were described in the grand jury subpoenas were removed from the main office of the corporation as soon as the year in which they were made and compiled ended, and they did not know where they are or whether they are in existence. If the Agent meant to testify that he saw some of the records which he had described in the administrative subpoenas on or about January 21, 1960, then he should have taken such action as was necessary to obtain possession of them, if they were not in fact delivered to him. The witness did not undertake to describe or designate the records which he claims he saw.

A comparison of the records described and listed in the grand jury subpoenas with the records described and listed in the administrative subpoenas reflects that substantially all the records that were set forth and described in the administrative subpoenas were later included in the grand jury subpoenas, except that the administrative subpoenas called for records covering slightly different dates from the dates the records described in the grand jury subpoenas covered.

In the argument the plaintiff contended that it was not required under the law to prove the guilt of the defendants beyond a reasonable doubt, and cited the case of Richardson v. United States (8 Cir. 1959), 273 F.2d 144, as an authority

for the contention, but a reading of the opinion does not support such contention. The learned attorneys relied upon the following statement in the opinion appearing on page 147:

"In the books and records cases it is well established that it is entirely proper to require the government to produce some evidence which would support a finding that records were available to the witness."

The plaintiff contends that by the use of the words "some evidence" the court intended to hold that the evidence need not be of such a nature as to convince the fact-finder of the guilt beyond a reasonable doubt. The court does not think that the opinion supports the contention in any respect. The question was not before the court, and the statement above set forth, relied upon by plaintiff, was made more or less in explanation of a contention of the defendant in that case. The opinion does not purport to announce the rule as to the degree of proof required.

Likewise, the plaintiff cited the case of Lopiparo v. United States (8 Cir. 1954), 216 F.2d 87, but a reading of that opinion does not sustain the contention.

■ The court is convinced that the plaintiff must establish the guilt of the defendants beyond a reasonable doubt before the court would be justified in finding them guilty.

In Michaelson v. United States, 266 U.S. 42, at page 66, 45 S.Ct. 18, at page 20, 69 L.Ed. 162, the court said:

"In criminal contempts, as in criminal cases, the presumption of innocence obtains. Proof of guilt must be beyond reasonable doubt and the defendant may not be compelled to be a witness against himself."

In Green v. United States, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672, the court, from pages 173 to 179 of 356 U. S., inclusive, discussed the testimony in the case, and beginning at the bottom of page 178, at page 640 of 78 S.Ct. the court said:

"No doubt some of this evidence lent itself to conflicting inferences, but those favorable to the petitioners were, in our view, not of such strength as to compel the trier of the facts to reject alternative unfavorable inferences. Our duty as an appellate court is to assess the evidence as a whole under the rigorous standards governing criminal trials, rather than to test by those standards each item of evidence relied on by the District Court. 9 Wigmore, Evidence (3d ed. 1940), § 2497; 1 Wharton, Criminal Evidence (12th ed. 1955), § 16. So viewing the entire record, we think the District Court was justified in finding that the evidence established, beyond a reasonable doubt, petitioners' knowing violations of the surrender order."

In Goldfine v. United States (1 Cir. 1959), 268 F.2d 941, the court recognized that the guilt of defendants must be established beyond a reasonable doubt. At page 944, the court said:

"We reject the contention that the evidence was not sufficient to establish beyond a reasonable doubt, what the district court found, that appellants deliberately and intentionally disobeyed the interim order of December 5, 1958."

■ ■ The records which the defendants were asked to produce were in existence during the current year in which they were made. Since the last record sought to be obtained was for the current year ending January 1, 1958, the plaintiff has had access to the business records of the corporation, which, of course, reflect the financial transactions of the corporation with the individual defendants. There can be no doubt that the records, if produced, would probably be helpful in establishing a criminal violation of the internal revenue laws by one or all of the defendants, but if the records are not in existence, the defendants are not required to explain what was done with the records or why they are not in their possession. The burden is upon

the plaintiff to establish beyond a reasonable doubt that the records are in existence. If that fact is established, then under the law the defendants, as officers of the corporation, should be compelled to produce them, for the law is as stated in United States v. Patterson (2 Cir. 1955), 219 F.2d 659, 660:

"The law of criminal contempt is clear that no individual may refuse to surrender existing documents of a corporation or association if they be within his control. United States v. Fleischman, 339 U.S. 349, 70 S. Ct. 739, 94 L.Ed. 906; United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542, 152 A.L.R. 1202; Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas. 1912D 558; United States v. Field, 2 Cir., 193 F.2d 92, certiorari denied 342 U.S. 894, 72 S.Ct. 202, 96 L.Ed. 670, certiorari dismissed 342 U.S. 908, 72 S.Ct. 303, 96 L.Ed. 679."

The case of Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L. Ed. 771, is the leading case for the proposition that corporate officers may not invoke their personal privilege against self-incrimination to prevent the production of corporate records, but Mr. Justice Hughes, speaking for the court in that case, recognized the distinction between the rights of the individual corporate officer and the corporation, when he stated at page 385 of 221 U.S. at page 546 of 31 S.Ct.:

" * * * They may decline to utter upon the witness stand a single self-criminating word. They may demand that any accusation against them individually be established without the aid of their oral testimony or the compulsory production by them of their private papers. But the visitatorial power which exists with respect to the corporation of necessity reaches the corporate books, without regard to the conduct of the custodian."

Thus, the contentions of the plaintiff that an officer has no constitutional privilege with respect to questions seeking to ascertain the whereabouts of books and records which have been subpoenaed but not produced, and that he must explain or account under oath for their nonproduction, even though to do so may tend to incriminate him, is without merit, because the Fifth Amendment guarantees that no person shall be compelled in any criminal case to be a witness against himself, and these defendants cannot lawfully be compelled, in the absence of a grant of adequate immunity from prosecution, to disclose by oral testimony the whereabouts of the books and records, nor to name the custodian or persons in whose possession the missing books may be found, and thus condemn themselves by their oral testimony.

In the oral argument the plaintiff sought to invoke the general rule that "when a statement tending to incriminate one accused of committing a crime is made in his presence and hearing, and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny are admissible in a criminal prosecution against him as evidence of his acquiescence in its truth." But, before such general rule may be considered, it must appear that the statement was made in the presence and hearing of the person accused of violating the law under such circumstances as would warrant the inference that such person would have naturally contradicted the statement if he did not assent to the truth.

The record is entirely devoid of any testimony whatsoever tending to establish that these defendants were accused by anyone of a violation of the law prior to their appearance before the grand jury in response to the subpoenas duces tecum. Even then they were not directly accused of violating any law, and they have not yet been formally accused of criminally violating the internal revenue laws. The investigating agents of the Internal Revenue Service may have thought that the defendants had violated the law, but no accusation or statement was made to them, or in their presence and hearing, that they were accusing

them of such violation, and they are not required to voluntarily make any statement as to their guilt or innocence. It was only when the grand jury inquired of them why they had not brought the records, where they were, and in whose custody they were, that they invoked the protection of the Fifth Amendment, as they had a perfect right to do.

■ During the hearing it developed that Douglas Walker & Co., widely known and respected certified public accountants, of Fort Smith, Arkansas, had over many years audited the accounts of the corporation and had prepared the income tax returns for the corporation and these defendants. No member of the firm of Douglas Walker & Co. was called as a witness at the hearing by the plaintiff or the defendants. The testimony of the accountants might have been helpful in ascertaining whether the records covered by the grand jury subpoenas are in existence and in whose possession they are, if they are in fact in existence, but since neither side called any member of the accounting firm as a witness, the court is not drawing any inferences either in favor of the plaintiff or against the defendants.

The plaintiff in the oral argument also relied on a presumption of continued possession and existence, and contended that since the records were once in existence, that fact should be held sufficient to constitute a prima facie case for the plaintiff.

■ In Maggio v. Zeitz, 333 U.S. 56, beginning on page 65 of 333 U.S., 68 S.Ct. 401, on page 406 of 68 S.Ct., 92 L.Ed. 476, the court said:

" * * * Language can, of course, be gleaned from judicial pronouncements and texts that conditions once existing may be presumed to continue until they are shown to have changed. But such generalizations, useful enough, perhaps, in solving some problem of a particular case, are not rules of law to be applied to all cases, with or without reason.

" * * * Under some circumstances it may be permissible, in resolving the unknown from the known, to reach the conclusion of present control from proof of previous possession. Such a process, sometimes characterized as 'presumption of fact,' is, however, nothing more than a process of reasoning from one fact to another, an argument which infers a fact otherwise doubtful from a fact which is proved."

The court in the Patterson case, supra, 219 F.2d at page 661, in commenting upon the above quotation, stated:

" * * * The presumption is thus no more than a common-sense inference, as strong or as weak as the nature of the surrounding circumstances permits. Brune v. Fraidin, 4 Cir., 149 F.2d 325. That also has been the established rule in this circuit. In the two cases where we have upheld a factual inference of present from past possession, the time period so spanned was short, and outside motivation for destruction of the particular records there involved was lacking. United States v. Goldstein, 2 Cir., 105 F.2d 150; In re Arctic Leather Garment Co., 2 Cir., 89 F.2d 871."

In the instant case, the only testimony that the plaintiff offered that the subpoenaed records were in the possession of the corporation or the defendants subsequent to January 31, 1958, was that of Special Agent Coger, whose testimony has heretofore been commented upon and rejected by the court. It must be borne in mind in considering whether any presumption of fact arises, that the records sought extended over a period from January 31, 1955, through January 31, 1958, or for a period extending back almost seven years, and in the meantime those records were doubtlessly used by the certified public accountants in their auditing of the accounts and the preparation of income tax returns. Also, it must be remembered that Special Agent Coger in 1959 and the early part of 1960 sought

to obtain some of the records by the use of the administrative subpoenas. The plaintiff in the oral argument did not contend that, in the absence of the presumption, an impossible burden will be placed on the Government if in cases like the instant one it must produce positive evidence of continued existence. But such an inference is implicit in the argument that was submitted.

In the Patterson case, supra, beginning at page 662, the court said:

" * * * While it is true that the prosecution need not negative every self-exculpatory suggestion of a recalcitrant witness, it cannot completely sidestep its burden of proving guilt beyond a reasonable doubt. The tests recently reiterated in United States v. Fleischman, 339 U.S. 349, 361, 70 S.Ct. 739, 745, 94 L.Ed. 906, emphasize that before the burden of proof may be shifted, the government's case must be independently established to some extent, and there must be a 'manifest disparity in convenience of proof and opportunity for knowledge.' Outside of the challenged inference and temporarily remote contradictory statements by the defendant, independent evidence for conviction is lacking here. More important, there is no 'manifest disparity in convenience of proof' when the defendant can extricate himself from his predicament only by opening the door to criminal prosecution on other charges. The defendant can here legally be jailed only for a contempt in failing to produce the sought-after books when they are fairly shown to be presently within his power and control. He cannot legally be jailed for contempt for invoking his constitutionally protected privilege not to be a witness against himself. But that in effect is what has happened. The result is the more strange, since court and counsel below respected his privilege and did not press him further or beyond the point stated. There is thus nothing to fill the gap in the proof;

hence his conviction must be reversed. Healey v. United States, supra, 9 Cir., 186 F.2d 164, 170, 171. We therefore remand the proceeding for his release."

See, also, Traub v. United States (C.A. D.C.1955), 98 U.S.App.D.C. 43, 232 F.2d 43.

▇ The plaintiff has failed to prove the existence of the records sought, or that they are in the possession of the corporation and thus under the control of the defendants. The defendants cannot be condemned for invoking the protection afforded by the Fifth Amendment to the Constitution of the United States to every citizen against self-incrimination, and under the facts and the law, the court is of the opinion that the defendants are not guilty of criminal contempt as charged by the plaintiff.

Therefore, an order is being entered today setting aside and dismissing the order to show cause heretofore issued by the court on January 18, 1962, and adjudging the defendants not guilty as charged in said order to show cause.