**Charles E. SIGETY, Petitioner,**

v.

**Robert ABRAMS, Attorney General of the State of New York, Charles Hynes, Deputy Attorney General of the State of New York (Special Prosecutor), and Edward A. Pichler, Sheriff of the City of New York, Respondents.**

**No. 79 Civ. 3455.**

United States District Court,
S. D. New York.

Feb. 15, 1980.

Squadron, Ellenoff, Plesent & Lehrer, New York City, for petitioner, by Ira L. Sorkin, New York City.

Charles J. Hynes, Deputy Atty. Gen., State of New York, New York City, for respondents, by James Bryan, New York City.

## AMENDED MEMORANDUM OPINION and ORDER

LOWE, District Judge.

This petition for Habeas Corpus, pursuant to 28 U.S.C. § 2254, requests review of a proceeding[1] in the Supreme Court of the State of New York, New York County, Trial Term, which resulted in an order being entered November 8, 1978 adjudging that petitioner, nursing home owner, had failed to produce books and records of the nursing home for the years 1970 and 1971 pursuant to a subpoena duces tecum and therefore had not purged a contempt of the court decreed after an initial finding of contempt on August 4, 1977. The August, 1977 decision directed that petitioner be incarcerated until the records were produced, or that he give a reasonable explanation for their nonproduction.[2]

A review of the prior proceedings is required to place the August 1978 hearing in context. On April 7, 1975, the Deputy Attorney General of the State of New York served the Florence Nightingale Nursing Home with an administrative, non-judicial subpoena duces tecum, pursuant to New York State Executive Law § 63(8), which, when modified, required the petitioner to produce the nursing home books and records for years 1970–1975. After unsuccessful litigation to quash, petitioner herein,

---

1. Referred to in this opinion as the August, 1978 hearing.

2. Citations hereinafter preceded by "R" refer to the record. R. 029.

sole proprietor of the nursing home, produced books and records for the years 1972–1975, but failed to produce the books and records for the years 1970 and 1971. The Deputy Attorney General brought on an Order to Show Cause pursuant to New York Civil Practice Law and Rules § 2308 (McKinney 1974) (hereinafter "CPLR"), to compel compliance. Hearings were held between November, 1976 and April, 1977. Petitioner presented witnesses, but did not testify himself. At the conclusion of petitioner's evidence, the presiding Justice held that petitioner had not presented a reasonable explanation for nonproduction of the books and records and that the evidence had shown that the 1970 and 1971 books and records were in existence and under petitioner's control when the subpoena was served. He further held that an inference of continued existence and possession may properly be drawn from the record. The hearing court found petitioner in civil contempt and directed he be imprisoned until he produced the missing books and records.

This ruling was reviewed and affirmed by the Appellate Division of the Supreme Court,[3] the New York State Court of Appeals,[4] the District Court (S.D.N.Y.),[5] and the Second Circuit Court of Appeals.[6]

After interim proceedings, petitioner made an application in August, 1978 to the trial court for a review hearing pursuant to CPLR § 2308(c). He had been incarcerated for 129 days.

Petitioner raised Fifth Amendment objections to questioning on cross-examination as to the "whereabouts" of the books and records prior to the date of the subpoena. The Court directed petitioner to answer.[7]

At the conclusion of the hearing, the hearing court held petitioner had failed to give a reasonable explanation for not producing the subpoenaed books and records, and continued petitioner's incarceration.[8] Petitioner appealed the Justice's order. The Appellate Division, First Department, unanimously affirmed the hearing court's order for the reasons stated by the hearing court. 67 A.D.2d 872, 413 N.Y.S.2d 1019 (1st Dept. 1979). Petitioner then took an appeal as a matter of right to the New York State Court of Appeals; the appeal was dismissed upon the grounds that the order appealed from did not finally determine the proceeding within the meaning of the Constitution and that no substantial constitutional question was directly involved.[9] Petitioner then returned to the Appellate Division, First Department, to seek leave to appeal to the New York State Court of Appeals; petitioner's motion for leave to appeal was denied on June 26, 1979.[10]

Since petitioner is under a sentence of incarceration pursuant to the Order of the hearing court, and that commitment was stayed by this Court pending its decision herein;[11] and New York State provides no further avenues of appellate review of the order of incarceration; this petitioner has exhausted his State remedies within the purview of 28 U.S.C. § 2254.[12]

The Second Circuit Court of Appeals recently held in *Twitty v. Smith*, 614 F.2d 325 (2d Cir. 1979) that in order to exhaust state remedies, a petitioner must have fairly presented to the state court the facts underlying the federal habeas corpus claim

---

3. *Hynes v. Sigety*, 60 A.D.2d 808, 401 N.Y.S.2d 749 (1st Dept. 1978).

4. *Hynes v. Sigety*, 43 N.Y.2d 947, 403 N.Y.S.2d 896, 374 N.E.2d 1247 (1978).

5. *Matter of Sigety v. Lefkowitz, et al.*, (S.D. N.Y. Apr. 6, 1978) (78 Civ. 1300 MEL) (habeas corpus proceeding).

6. *Sigety v. Lefkowitz, et al.*, (2d Cir. Apr. 11, 1978).

7. R. 790.

8. R. 970–96.

9. Affidavit of Robert E. Goldman (attorney for petitioner) at Exhibit 5.

10. *Id.* at Exhibit 6.

11. 28 U.S.C. § 2251.

12. *New York Telephone Co. v. Communications Wkrs. of Amer.*, 445 F.2d 39 (2d Cir. 1971); *Cobbledick v. United States*, 309 U.S. 323, 328, 60 S.Ct. 540, 542, 84 L.Ed. 783 (1940).

alleged, and that the state court must have been informed of the legal basis of the claim.

Since the decision of the Appellate Division, First Department, was affirmed on the trial Justice's decision and order, and the Court of Appeals dismissed the appeal, this Court must search the record before the Appellate Division and hearing court to determine whether petitioner raised the federal claims, herein asserted, in the State Court proceedings.

*The Issues Before The Appellate Division*

■ Appellant's (present petitioner's) Points before the Appellate Division were, *inter alia*:

It was error for the hearing court to require Sigety to testify in the face of an assertion of his Fifth Amendment privilege against self-incrimination.[13]

The Special Prosecutor (Deputy Attorney General) has failed to meet his burden of establishing that the missing records exist and the appellant can produce them.

Respondent's Points before the Appellate Division were, *inter alia*:

A person claiming inability to comply with a court order or a judicially enforced subpoena has the burden of proof as to that claimed inability.

Sigety has not offered a reasonable explanation for not complying with the Order of the hearing court and the judicially enforced subpoena of the Deputy Attorney General.

This Court finds that the issues raised herein comply with the requirements of *Twitty v. Smith, supra.*

Petitioner cannot relitigate the issues, raised and decided in the original contempt citation. A review of the record made before petitioner's August, 1978 hearing is foreclosed as *res judicata*. *Maggio v. Zeitz,*

333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476 (1948). The fact that petitioner testified at the August, 1978 hearing and he did not testify at the prior August, 1977 proceeding makes the issue raised in the instant application separate and distinct, in fact and law, from the prior proceedings.

*The August, 1978 Proceeding*

Section 2308(b) of the CPLR, the provision of the New York Statute herein implicated, and under which Sigety was held in contempt, provides:

> "If a person so subpoenaed . . . is brought before such person or body, but refuses without reasonable cause to be examined, or to answer a legal and pertinent question, or to produce a book, paper or other thing which he was directed to produce by the subpoena, . . . the court, upon proof by affidavit, may issue a warrant . . . committing him to jail, there to remain until he submits to do the act which he was so required to do or is discharged according to law."

The hearing court ruled, and the respondent argued before the Appellate Division:

> "Thus, as Justice McQuillan ruled, once a prima facie case of contempt has been established, Section 2308(b) of the CPLR places a 'statutorily prescribed burden [upon the subpoenaed party] of proffering a reasonable explanation for non-compliance with the subpoena's demand." [See discussion, Brief of Respondent-Attorney General to Appellate Division at Point II, pp. 37–44.]

The hearing court ruled that Sigety's application to testify as to his inability to produce the books and records was a voluntary act and that once petitioner gave direct testimony of present inability to comply, he waived his Fifth Amendment rights and could be cross-examined on any relevant issue including the whereabouts of the

---

**13.** Respondent alleges in his Notice of Motion to dismiss the petition herein at p. 5 that petitioner did not present the Fifth Amendment cross-examination claim to the Appellate Division (pp. 22–38, 47–57), and petitioner's reply brief (pp. 22–23) shows this assertion to be in error. The Fifth Amendment violation alleged only became operative when respondent asserted the privilege and, over objection, was cross-examined as to the whereabouts of the missing records.

books and records.[14] Sigety testified on direct examination that he did not have the present ability nor has he had the ability since service of the subpoena, to produce the required books and records.

The first question asked by the Deputy Attorney General on cross-examination concerned the "whereabouts" of the books and records. Sigety declined to answer, asserting a Fifth Amendment privilege.[15] After extensive colloquy, the Deputy Attorney General moved to strike Sigety's direct testimony on the ground that Sigety's invocation of the Fifth Amendment denied him the right to meaningful cross-examination.[16]

Sigety's counsel objected, citing *Curcio v. United States*, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957), stating, that if the court ruled that the privilege did not apply, unless his client testified, over objection, there would be nothing in the record by which Sigety could purge himself of contempt.[17] The Deputy Attorney General moved to strike petitioner's direct testimony. The court responded:

"Well so the records is rather clear, perhaps at this time . . . you might put a question to Mr. Sigety so that I might have something specific and concrete to rule on.

Mr. Ruck (Deputy Attorney General): Well, I'd be happy to. Let me once again ask Mr. Sigety—

Q. Please tell us then what happened to the missing books and records?

A. Mr. Ruck, I'm not able to answer that question because of the Fifth Amendment of the Constitution of the United States.

Mr. Ruck: Your Honor, insofar as that question of course directly relates to the sole subject matter of the witness' direct testimony, in order that we may have a

meaningful cross-examination, I ask the court at this time to direct the witness to answer the question, insofar as any privilege against self-incrimination with respect to that matter has indeed been waived by his having testified to that matter already.'".[18]

The hearing court ruled:

"The respondent-witness is directed to answer the pending question since that question is germane, it's relevant, and it's material to the testimony given on direct examination, and accordingly there is no basis to claim the Fifth Amendment with respect to that pending question. Accordingly, the respondent-witness is directed to answer the pending question."[19]

Sigety then answered all questions put to him on cross-examination concerning his knowledge or lack of knowledge of the whereabouts of the records.[20]

At the conclusion of the hearing, Justice McQuillan ruled that respondent did not proffer a reasonable explanation for noncompliance with the subpoena's command. Sigety's testimony, the hearing court held, was equivalent to no explanation whatsoever of why the 1970 and 1971 books and records were not produced; it was inherently incredible and implausible, too weak, too suspicious under the circumstances to accept. The Court continued its order of incarceration until respondent produces the 1970 and 1971 documents or proffers a reasonable explanation for their nonproduction.[21]

### The Fifth Amendment Claim

◼ Every person subject to the jurisdiction of a competent tribunal is bound to give testimony except when the answers

---

**14.** *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589, *reh. denied*, 356 U.S. 948, 78 S.Ct. 776, 2 L.Ed.2d 822 (1958), was cited by respondent in his brief to this Court as authority for this ruling.

**15.** R. 765.

**16.** R. 778.

**17.** R. 782.

**18.** R. 787–88.

**19.** R. 790.

**20.** R. 790–947.

**21.** R. 970–96.

sought are subject to a valid claim of privilege. The Fifth Amendment privilege is personal and may not be invoked in favor of the corporation by a corporate custodian of books and records.[22] The protection of the Fifth Amendment operates only when a witness is asked to incriminate *himself*, that is, to give testimony which may possibly expose the witness *in futuro*, to criminal charges for the acts revealed, or information leading to the revelation of past criminal conduct which may be the subject of a present prosecution.[23] The compulsion of a witness' testimony, which would tend to connect him with a crime, is the essence of the Fifth Amendment interdiction.[24]

■ *Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911) is the seminal case in this area. *Wilson* clearly delineates the two components of the subpoena process and its constitutional relationship to corporate books and records. A subpoena may be solely *ad testificandum*, commanding the testimony of the person served, or it may be solely *duces tecum*, requiring the production of tangible property, or it may serve both functions. Whenever a subpoena served upon a corporation is challenged, the analysis must always begin with the nature of the act required, *i. e.*, testimony or production of papers, and the relationship of the challenger to the subject matter of the subpoena.

In *United States v. Austin-Bagley Corporation*, 31 F.2d 229, 234 (2d Cir. 1929), *cert. denied*, 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002 (1929), Judge Learned Hand held that whenever documents may be compelled, the custodian may be compelled to authenticate them. Since the production of the records is not subject to a claim of privilege, authentication testimony *auxiliary to the production* is likewise unprivileged. (emphasis added).

■ Different considerations apply when the custodian fails to produce records in response to a subpoena duces tecum. In contrast to the producing custodian, who gives testimony auxiliary to production which authenticates the produced documents, a non-producing custodian must state that the demanded documents are not in his possession or under his present power to produce. *United States v. O'Henry's Film Works, Inc., supra. United States v. Fleischman*, 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906, *reh. denied*, 339 U.S. 991, 70 S.Ct. 1017, 94 L.Ed. 1391 (1950), held that when a person does not produce records under subpoena, she has the burden of introducing "evidence as to what steps she took *after receiving the subpoena*, or, if she took no action, any evidence tending to excuse her omission." *Id.* at 363, 70 S.Ct. at 746. (emphasis added).

*Curcio v. United States, supra*, posed the question whether Curcio, secretary-treasurer of a union, served with a subpoena *duces tecum* and *ad testificandum*, in his representative capacity, to produce union books before a Grand Jury, could be held in contempt for refusing on the grounds of self-incrimination to answer questions as to the whereabouts of the books he failed to produce.

---

**22.** The Deputy Attorney General argues in his reply brief to this Court at page 7, that *United States v. O'Henry's Film Works, Inc.*, 598 F.2d 313 (2d Cir. 1979) does not apply to a person subpoenaed to produce his own records, that the records involved herein are the records of a nursing home owner, and that Sigety is the sole proprietor. This argument cannot be sustained. The law of this case is set forth in the decision and Order of Justice McQuillan, dated August 4, 1977. Justice McQuillan overruled petitioner's claim that he may not be compelled to produce his business records under the Fifth Amendment. The Justice held in his prior opinion of September 15, 1976, that the books and records were not petitioner's personal and private records and must be submitted for an audit on demand by the New York State Department of Health. R. 017–18. The law of the case therefore is that the records demanded by the 1975 subpoena are within the doctrine of *United States v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944).

**23.** *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212, *reh. denied*, 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 345 (1972).

**24.** *New Jersey v. Portash*, 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979).

The United States Supreme Court held that the Fifth Amendment privilege was applicable:

". . . the Government reasons that he also has no privilege with respect to questions seeking to ascertain the whereabouts of books and records which have been subpoenaed but not produced. In other words, when the custodian fails to produce the books, he must, according to the Government, explain or account under oath for their nonproduction, even though to do so may tend to incriminate him. The Fifth Amendment suggests no such exception." *Id.*, 354 U.S. at 123, 77 S.Ct. at 1149.

*McPhaul v. United States*, 364 U.S. 372, 81 S.Ct. 138, 5 L.Ed.2d 136, *reh. denied*, 364 U.S. 925, 81 S.Ct. 282, 5 L.Ed.2d 264 (1960), is another important nonproduction case impacting on the present analysis. McPhaul, an executive secretary of the Civil Rights Congress, was convicted of criminal contempt. He was served with a subpoena *duces tecum* to produce the organization's books and records before a Congressional Committee. McPhaul appeared and did not produce the books and records stating that he refused to answer any questions dealing with possession or custody of the books and records on the ground of the Fifth Amendment. On appeal from his contempt conviction, the United States Supreme Court, in affirming the conviction, stated, if McPhaul had informed the Congressional Committee of his reason for noncompliance, *i. e.*, denial of existence or control, the Committee would have had an opportunity to take other appropriate steps to obtain the records.[25] The failure to apprise the Committee was " 'a patent evasion of the *duty of one summoned to produce papers*' ". *Id.* at 379, 81 S.Ct. at 142. (emphasis added).

The Second Circuit Court of Appeals recently considered this question in *United States v. O'Henry's Film Works, Inc., supra.* Judge Edelstein (D. J.), writing for the court, made three points:

1. McPhaul [*McPhaul v. United States, supra*] was convicted of contempt because he failed to make any statement regarding his nonproduction of the records.

2. A putative custodian of books and records must state upon nonproduction that he does not possess them, such statement cannot be construed as a waiver of the custodian's Fifth Amendment privilege:

"A plain reading of *Curcio* and *McPhaul* leads to the conclusion that the duty of the putative custodian of an organization's records extends beyond mere production or nonproduction: when the agent fails to produce documents that are the subject of a valid summons or subpoena, if called before a court, he must give sworn testimony that he does not possess them. The agent's statement that he does not possess the records at issue is merely part of his duty to comply with a lawful demand for them. It might be called 'testimony auxiliary to his nonproduction,' . . . . Because the agent's testimony is unprivileged, it is not a waiver of his privilege against self-incrimination as to other matters." [*United States v. O'Henry's Film Works, Inc., supra* at 318.]

3. A unanimous Court held in *Curcio v. United States, supra*, that a putative custodian could not be compelled to testify regarding the whereabouts of corporate books and records because such testimony might lead to a criminal conviction.

The respondent cited, in the Appellate Division, First Department, *Bleakley v. Schlesinger*, 294 N.Y. 312, 62 N.E.2d 85 (1945), in support of the hearing court's holding that CPLR § 2308 places a burden on the subpoenaed party of proffering a reasonable explanation for noncompliance, despite a Fifth Amendment assertion.

A review of the *Schlesinger* case discloses that Moreland Act Commissioners investigating kickbacks in the medical industry

**25.** *Citing United States v. Bryan*, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884, *reh. denied*, 339 U.S. 991, 70 S.Ct. 1018, 94 L.Ed. 1391 (1950) and

*Bevan v. Kreiger*, 289 U.S. 459, 464–465, 53 S.Ct. 661, 662–663, 77 L.Ed. 1316 (1933).

served a subpoena *duces tecum* upon Schlesinger who was secretary-treasurer of a target corporation. The subpoena directed him to produce all books and records for certain time periods. Schlesinger appeared at the appointed time, refused to produce the wanted books, and stated: "I am unable to produce them." When asked "Why are you unable to produce them?", he replied: "I refuse to answer on the grounds that it may tend to incriminate or degrade me." *Id.* at 316, 62 N.E.2d at 86.

The New York State Court of Appeals opinion stated:

"It should be pointed out that the appellant claims no exception under the long-recognized rule that a corporate officer cannot refuse to produce its books and records on the ground that the disclosure might incriminate the corporation, *United States v. Austin-Bagley Corporation*, 2 Cir., 31 F.2d 229, or that the contents of such books might incriminate an officer thereof, *Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas. 1912D, 558, but seeks to justify his tenuous position by claiming that distinction exists between his refusal to produce the books on the ground that they might incriminate him, on the one hand, and his failure to produce the books because he is 'unable to' plus his unwillingness to explain his inability to produce them because of his resolute conclusion that the answer would tend to incriminate him as an individual on the other." [*Id.* at 316–17, 62 N.E.2d at 86].

The New York State Court of Appeals found that the books and records were last seen in Schlesinger's possession five months before the subpoena was served. The court held that to recognize a Fifth Amendment claim would create an immunity for the corporation which is neither found in the constitution nor authorized by statute. The court held that a corporate officer must:

"either produce the wanted corporate books or give a reasonable explanation of his inability to do so, with the alternative of commitment as ordained by section 406 of the Civil Practice Act." [26] [*Id.* at 317, 62 N.E.2d at 86.]

The *Curcio* Court, in holding the privilege is properly asserted by a corporate custodian as a bar to testimonial compulsion concerning the whereabouts of unproduced books and records, expressly mentioned *Bleakley v. Schlesinger, supra*.[27] After stating the *Schlesinger* holding, the Court said:

"But cf. *Bradley v. O'Hare*, 2 App.Div.2d 436, 156 N.Y.S.2d 533, where questions put to a union official relating to the whereabouts of union records were held privileged." [28]

At 354 U.S. 118, 127, n.6, 77 S.Ct. 1145, 1151, 1 L.Ed.2d 1225, the Court said, *inter alia* :

"See also, *Lopiparo v. United States*, 8 Cir., 216 F.2d 87, where the trial court upheld the custodian's claim of privilege with respect to oral testimony pertaining to corporate records."

This *sub silentio* treatment of the *Schlesinger* case makes its authority a very slender reed, since its very premise is *contra Curcio*'s express holding.

█ This Court holds that upon the facts herein, and under the applicable law, the present petitioner, having been served with a subpoena *duces tecum* for the production of books and records which he did not produce, was required to give testimony auxiliary to nonproduction explaining his present inability to produce the records. Testimony of present inability to produce is *not* subject to the Fifth Amendment privilege since it is implicit in the duty imposed under a subpoena *duces tecum*. As distinguished from testimony auxiliary to nonproduction which is unprivileged, questions concerning the whereabouts of the books and records, prior to issuance of the subpoena, are subject to a claim of privilege if the party believes his

---

26. Section 406 of the Civil Practice Act was the predecessor statute to the present CPLR § 2308.

27. *Curcio v. United States, supra*, 354 U.S. at 126, n.5, 77 S.Ct. at 1151.

28. *Id.*

answers would tend to incriminate him. *United States v. Austin-Bagley Corporation, supra; United States v. Fleischman, supra; Curcio v. United States, supra; McPhaul v. United States, supra; United States v. O'Henry's Film Works, Inc., supra.*

### Did Petitioner Waive His Fifth Amendment Privilege?

Petitioner's counsel informed the court that petitioner would be willing to testify under oath that he has not had the missing books and records in his possession, custody or control at any time on or after April 7, 1975, the date upon which service of the subpoena was made and is thus not capable of producing them. Counsel contended that on a hearing to review a civil commitment, the issue that the court must decide is the present ability of the contemnor to comply with the court's order.[29] Counsel further informed the court that if petitioner testified with regard to present inability to produce, he would invoke his Fifth Amendment privilege when asked any questions as to the whereabouts of the records citing *Curcio v. United States, supra.*[30] Counsel asked the court to rule on his client's Fifth Amendment claims prior to the offer of any testimony.

The Deputy Attorney General argued that petitioner had the burden of giving the court reasonable cause for his noncompliance and that the Deputy Attorney General, should be free on cross-examination to explore petitioner's knowledge as to the whereabouts and existence of the records because this is the only way petitioner can convince the court that he had reasonable cause for not producing them.[31]

The hearing court resolved the contentions of the parties as follows:

"If the respondent [Sigety] wishes to testify, he certainly has the right to do that. But no one may elect to testify in a proceeding such as this, conditioned upon the fact that he or she will limit the scope of cross examination."

"If the respondent wishes to testify, he is free to do so, certainly. But when the petitioner-attorney general puts questions to him on cross examination and I rule that the question is material and proper and relates to the testimony given by the respondent on direct examination, than [sic] of course, he has no fifth amendment privilege and must answer."[32]

Sigety's counsel then put the following query to the hearing court:

"The first question, I think, that has to be addressed is whether there is a fifth amendment privilege with regard to the whereabouts of the records in the first instance?"

The hearing court responded:

"Well, let me say this: Certainly there is a fifth amendment privilege in the respondent, and anyone else, not to answer any questions that the witness may feel tend to incriminate him. But let [sic] also say this: The respondent in no fashion is actually compelled to testify. The purpose of the commitment was not to seek an explanation from the respondent or anyone else, as to where the books and records are, or what happened to the books and records. My order, which was affirmed on appeal by the Appellate Division is to the effect that the respondent has the ability to produce the books and records, that he has the books and records, and that the books and records were not produced, and that no reasonable explanation was offered for their nonproduction. If the respondent feels that if he were to testify and explained what happened to the books and records, that it would incriminate him, that is a dilemma that he has placed himself in, as the cases indicate. But no one at all is forcing the respondent to give up his first [sic Fifth] amendment privilege. The purpose of the order is to compel the production of

**29.** R. 647–75.

**30.** R. 647–67.

**31.** R. 676–77.

**32.** R. 718.

the books and records and nothing else." [33]

Following the ruling, petitioner's counsel informed the hearing court petitioner would testify involuntarily because he had no other way of ending his incarceration.[34]

Respondent cites *American Cyanamid Co. v. Fox*, 19 A.D.2d 872, 244 N.Y.S.2d 91 (1st Dept. 1963) and numerous other cases in his brief to the Appellate Division in support of the proposition that under the New York rule, the contemnor must come forward with "frank and full disclosure of relevant facts tending to establish his inability in good faith to comply with the turnover direction." [35]

█ The content of the testimonial assertion required by CPLR § 2308(b) and the posture of the contemnor at a "Purge Hearing" mandated by CPLR § 2308(c), in accordance with *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), must comport with federal constitutional standards. Under Fifth Amendment doctrine, a witness who testifies voluntarily waives the right to assert the privilege against self-incrimination when cross-examined on issues relevant to the direct testimony. *Brown v. United States, supra*. A witness whose testimony is compelled, has the absolute right to refuse to answer any question which the witness believes would tend to incriminate him. *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). In *Brown*, the defendant, at her trial for criminal contempt, chose not to remain silent and took the witness stand to testify in her own behalf. She had the privilege available to her and voluntarily waived it as to all matters relevant to her direct testimony and credibility. She was a voluntary witness. *Arndstein v. McCarthy*, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138, *reh. denied*, 254 U.S. 379, 41 S.Ct. 136, 65 L.Ed. 314 (1920); *McCarthy*

*v. Arndstein*, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023 (1923), *aff'd on rehearing*, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924), explicitly cited in the *Brown* case as an exception to its rule, is not only interesting because it went before the United States Supreme Court three times, but also because it illumines the concept of Fifth Amendment compulsion. Arndstein filed schedules required under the Bankruptcy Act of July 1, 1898, c. 541, 30 Stat. 544, 552, as amended, to institute an involuntary bankruptcy proceeding. Pursuant to a subpoena issued under § 21a of the Bankruptcy Act,[36] he appeared before a special commissioner for examination of his assets. He was sworn as a witness, and testified as to certain of his present accounts; he then invoked the Fifth Amendment to cut off further questioning, and refused to answer. He was cited for contempt. Mr. Justice Brandeis, writing for the Court, in the third decision, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158, stated that although the bankrupt must surrender his books and accounts, even though they contain incriminating evidence, when he is called to testify, he appears as any other witness and has the right to assert his Fifth Amendment privilege to questions he believes will incriminate him. Since Congress did not grant complete immunity for testimony under § 21a of the Bankruptcy Act, the Court could not compel his testimony over his assertion of privilege.

An examination of the posture of the petitioner herein at the "Purge Review" hearing of August, 1978 reveals that he was then incarcerated for disobedience to a subpoena issued and enforced pursuant to CPLR § 2308(b). The justification for his coercive imprisonment was the finding of the hearing court in 1977 that, at that time, he had the ability to produce the 1970 and 1971 books and records. Recognizing that

33. R. 718–19.

34. R. 730–31.

35. Respondent's Brief to Appellate Division at 37–44.

36. Section 21a of the Act provided that the court may ". . . require any designated

person, including the bankrupt . . . to be examined concerning the acts, conduct, or property of a bankrupt whose estate is in process of administration." See, *McCarthy v. Arndstein*, 266 U.S. 34, 39, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924).

indefinite incarceration is punitive rather than coercive, the Legislature of the State of New York mandated in CPLR § 2308(c) that the court conduct a Review proceeding every ninety days.

> "(c) *Review of proceedings.* Within ninety days after the offender shall have been committed to jail he shall, . . . be brought . . . personally before the court issuing the warrant of commitment and a review of the proceedings shall then be held to determine whether the offender shall be discharged from commitment."

Constitutionally implicit in the standard for review was the inquiry as to the present ability of the contemnor to comply with the command to produce embodied in the subpoena served in 1975. An Order to comply does not arise separate and apart from the compulsion inherent in the subpoena, and the disobedience command of CPLR § 2308(b), *i. e.,* ". . . committing him to jail, there to remain until he submits to do the act which he was so required to do . . .", is a continuing exercise of the court's jurisdiction and power. See, *Nixon v. Sirica,* 159 U.S.App.D.C. 58, 68, 487 F.2d 700, 710. (D.C. Cir. 1973).

▮ It is of no constitutional significance whether the Review Hearing was initiated by the petitioner bringing on an Order to Show Cause or the court initiating the proceeding *sua sponte* under CPLR § 2308(c). Once the court commenced the hearing, it was under a duty to determine the then ability of the contemnor to comply with the subpoena. *Maggio v. Zeitz, supra.* At such hearing the court had the absolute right to demand that the petitioner give testimony auxiliary to nonproduction of the subpoenaed books and records or, if the court did not so demand, the petitioner had the absolute right to testify as to his inability to comply. The court's right to demand the testimony derives from its non-privileged character; the petitioner's right to give the testimony flows from the statutory command of CPLR § 2308(b) that the subpoenaed party produce *or* give a reasonable explanation why he cannot. The compulsion inherent in the 1975 subpoena, once a

finding of disobedience is made, continues throughout the course of the incarceration, until the court, as a result of the periodic review, finds the contemnor is no longer contumacious.

Although this Court will not review the direct testimony of the petitioner at the "Purge Hearing" to determine its factual credibility, or whether the petitioner offered a reasonable explanation for nonproduction, this Court must review his testimony to determine whether or not it was the equivalent of testimony auxiliary to nonproduction. *United States v. O'Henry's Film Works, Inc., supra.*

In his testimony Sigety admitted service of the subpoena in April, 1975, requesting books and records from 1970 to the date of the subpoena; that he produced all of the books and records he was able to produce; that he did not produce the books and records for the years 1970 and 1971 because he presently does not know anyone who has those books and records; that he does not have those books and records nor did he have them or know anyone who had them on the date the subpoena was served; that he knows of no action he could take to produce those books and records; that he has been incarcerated for 129 days in the Queens House of Detention, a maximum security prison, on the same tier with a prisoner who has been convicted of homicide and is awaiting trial on another homicide; that his quarters are a five foot by eight foot cell; that he has had no fresh vegetables and only eight pieces of fruit in 400 meals and that his family has suffered because of his detention.

The Court finds the testimony summarized above is within the doctrine of testimony auxiliary to nonproduction.

▮ The concepts of voluntariness and compulsion under Fifth Amendment analysis have very little to do with the race to the courthouse door. A witness in any case, civil or criminal, witness or party, who has available to him the right to assert the privilege against self-incrimination and refuses to invoke it before testifying,

waives the privilege and is denominated a voluntary witness. *Brown v. United States, supra.* On the other hand, a witness who has available to him the right to assert the privilege and asserts the privilege, can be compelled to testify only if he is granted immunity as broad as the privilege. *Kastigar v. United States, supra.* A witness testifying under compulsion of a subpoena *ad testificandum* must answer all relevant questions until that point arises in his testimony when incriminating matter for the first time is sought to be elicited; at that point the witness has the constitutional right to cut off questioning by asserting his Fifth Amendment privilege. *McCarthy v. Arndstein,* 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924). A witness who testifies under the compulsion of a subpoena *duces tecum* must give testimony auxiliary to production authenticating the records produced, *United States v. Austin-Bagley Corporation, supra* ; or, if he does not produce the records commanded, he must give testimony auxiliary to nonproduction stating his present inability to comply. *United States v. O'Henry's Film Works, Inc., supra.*

The petitioner in offering his direct testimony was not a voluntary witness in the Fifth Amendment sense. His testimony was compelled by the implicit command of the 1975 subpoena made explicit in the statutory language of CPLR § 2308(b). Since his testimony was unprivileged, he did not waive his Fifth Amendment right because he had none to waive as to this testimony. When he was questioned on cross-examination concerning the whereabouts of the books and records, for the first time, testimony was sought to be elicited which he had a Fifth Amendment right to refuse to answer, if he believed it would tend to incriminate him. His testimony could not constitutionally be compelled anymore than Arndstein's testimony could be compelled, i.

e., unless immunity was conferred as broad as the privilege asserted. The hearing court expressly refused to grant petitioner immunity.

The hearing Court adjudged petitioner in continuing contempt of the 1975 subpoena based upon testimony elicited from petitioner in violation of his properly asserted Fifth Amendment privilege. Petitioner's confinement is therefore in violation of the process of law that is due him under the proscription of the Fifth Amendment.[37]

If a Review Hearing, pursuant to CPLR § 2308(c) is not held within sixty (60) days of the date of this Court's Memorandum Opinion and Order, petitioner shall be released from all further custody with respect to the subpoena duces tecum served upon him in 1975. The stay of imprisonment granted by this Court is continued until the Supreme Court of the State of New York, Trial Term, renders its decision after the Review Hearing.

It Is So Ordered.

---

**37.** This does not mean that exercise of the Fifth Amendment privilege frees the contemnor of his obligation to produce the records if he has the ability to do so, nor does its non-evidentiary exercise supply a basis for a favorable finding. It only prevents the practice, condemned by the *Curcio* Court, of using the temporarily unlimited civil contempt power, as a punitive rather than as a rationally coercive procedure. The *Curcio* Court held that the recalcitrant contemnor, who deliberately thwarts the order of the court to produce could be dealt with in constitutionally acceptable procedures.