**In re CANDOR DIAMOND CORP., Debtor.**

**JOHN P. MAGUIRE & CO., INC., Plaintiff,**

**v.**

**Jeffrey SAPIR, Interim Trustee of Candor Diamond Corp., Debtor; Madeleine Margolies and Scarsdale National Bank and Trust Company, Defendants.**

**Bankruptcy No. 81 B 11594 (EJR). Adv. No. 81 5713–A.**

United States Bankruptcy Court, S. D. New York.

June 22, 1982.

Hahn & Hessen, New York City, for plaintiff, John P. Maguire & Co., Inc.

Neale & Wilson & Gardella, Scarsdale, N. Y., for defendant Scarsdale Nat. Bank and Trust Co.

Schnapper & Isaacson, New York City, for defendant Madeleine Margolies.

Stroock & Stroock & Lavan, New York City, for trustee in bankruptcy Daniel McColley.

## DECISION ON MADELEINE MARGO-LIES' ASSERTION OF FIFTH AMENDMENT PRIVILEGE

EDWARD J. RYAN, Bankruptcy Judge.

On March 21, 1980, Candor Diamond Corp. ("Candor"), a corporation in the business of selling and manufacturing gold jewelry and diamonds, entered into a factoring agreement with John P. Maguire & Co., Inc. ("Maguire"). Madeleine Margolies and her husband, Irwin, executed these agreements as officers of Candor. These agreements provided, *inter alia,* for the purchase by Maguire of Candor's accounts receivable and for Maguire to advance monies to Candor in anticipation of collection of the purchased accounts receivable. As security for the advances, Maguire was given a security interest in Candor's accounts receivable and inventory.

On August 10, 1981, Maguire commenced involuntary proceedings pursuant to Title 11, United States Code, Chapter 7, Section 303, in this Court against Candor. Candor, by its attorney, consented to the involuntary petition and an Interim Trustee was appointed. Contemporaneous with the bankruptcy filing, the Federal Bureau of Investigation was notified and the Office of the United States Attorney for the Southern District of New York commenced an investigation into the activities and whereabouts of Irwin Margolies and Madeleine Margolies. Madeleine Margolies had known since the early Fall of 1981 that she was the target of an investigation by the federal authorities.

On October 27, 1981, Maguire was advised that Madeleine Margolies had gone to the Scarsdale National Bank and Trust Company and presented a check in the sum of $180,000 drawn on Bank Cantrade A.G. of Zurich, Switzerland. This check was proffered by Madeleine Margolies in full payment and satisfaction of a Candor loan which was secured by a mortgage on Madeleine Margolies' home in Scarsdale, New York. On October 30, 1981, an order to show cause was signed by this court temporarily enjoining the application of the proceeds of the Bank Cantrade check to the Scarsdale mortgage and directing Scarsdale to transfer the proceeds of the check to the Interim Trustee to be held in a special account at interest.

The order to show cause was supported by an affidavit and documentary evidence alleging a fraud perpetrated upon Maguire and contending that Madeleine Margolies did not have sufficient income or personal assets to justify her possession of the sum of $180,000. Maguire contends that the Bank Cantrade check constitutes part of the proceeds of Candor's property, under Section 541 of the Bankruptcy Code, which were illegally and wrongfully taken and converted to the possession of Madeleine Margolies.

The order to show cause, which sought the issuance of a preliminary injunction, was returnable on November 4, 1981. Prior to the commencement of the preliminary injunction hearing, Madeleine Margolies, vigorously contesting the issuance of the preliminary injunction, submitted her sworn affidavit which stated:

"I am the owner of 6 Hadden Road, Scarsdale, New York, and have been the owner of said property since August of 1971.

"*The aforementioned premises is my home.* I am married to Irwin Margolies and we have two children namely Steven and Douglas. My husband and children reside with me at the premises in question.

"After the adjudication of Candor Diamond Corp. as a bankrupt *my attorneys informed me that Scarsdale National Bank believed to be a wholly owned subsidiary of Irving Trust Company as is the factor, might move to seize my home, without notice and without the institution of any type of legal proceeding.*

"Accordingly, I actively sought a new mortgage so that this horrendous event could not take place.

"I was never actively engaged in the business of Candor Diamond Corp. In fact I resigned as an officer of Candor in November of 1980. Candor was my husband's business since from its inception he was the sole stockholder. Any checks made out to cash, that bore my endorsement, were for the purpose of purchasing stamps, supplies, etc. for the corporation.

All such withdrawals were well documented in the Candor books and records which have seemingly disappeared.

"*The 'leased cars' have been returned to the lessor.* At the time that we entered into said leases I was under the distinct impression that we could afford them. When I discovered that Candor Diamond Corp. and my husband had severe financial problems I removed myself from said leases.

"The check for $180,000.00 which I delivered to Scarsdale National Bank does not consist of any funds belonging to me, nor my husband nor my children nor to any member of our family.

"In fact the $180,000.00 represent the gross proceeds of a mortgage that was procured from H. W. Frye Realty Co. Inc. in order to satisfy the second mortgage of Scarsdale National Bank.

"I respectfully request that said petition be denied in all respects." (emphasis in original)

The preliminary injunction hearing commenced at 1:00 p. m. on November 4th. The first witness called to the stand by Maguire was defendant Margolies. Counsel for Maguire examined Margolies for a short time until cut off by a request from her counsel for an adjournment. During the brief period of examination, Margolies testified to the following:

That she purchased real estate in Florida in 1981 which cost about $150,000; said monies were borrowed from her parents and did not come from Candor or Irwin Margolies (Transcript 11/4/81, pp. 3–5);

That she was an officer of Candor and resigned in the fall of 1980; that the reason she resigned was she wanted to go into her own business, that she was getting under her husband's feet and she therefore formed Madeleine Chain Corp.; that after her resignation from Candor, she answered Candor's phone and helped pack and ship goods if needed. (Id., pp. 6–7);

That she received about $500.00 a week salary from Candor both before and after

her resignation; that she only did odds and ends for Candor both before and after her resignation (Id., pp. 8–9);

That she did not prepare her own tax returns, doesn't know the total amount of her income and does not have a copy of her income tax returns to produce (Id., pp. 10–16);

That she has no knowledge of the financial workings of Candor; she had authority to sign checks for Candor which was revoked and that any Candor checks made out to cash bearing her endorsement were for the purpose of purchasing stamps, supplies, etc. (Id., pp. 16–20);

That she maintains two personal checking accounts but does not have possession of cancelled checks or bank statements for July and August of 1981. (Id., pp. 21–22);

That she left for vacation in Israel on or about July 28, 1981 with her husband; that she left the United States with a few hundred dollars in cash and had no valuable gems with her other than a diamond ring and diamond earrings; that she does not know how much money her husband had in his possession but testified that her husband had no gems or travelers checks; that they were in Israel for two and a half weeks where her husband sold her diamond ring and earrings for about $35,000, stating that he had business problems with an employee who had been embezzling; that the sale of her diamond ring and earrings was the only business transaction conducted in Israel; that although Mr. and Mrs. Margolies planned to go to Israel and fly directly back to the United States, they left Israel and travelled to Munich, Germany, where they rented a car and drove to Zurich, Switzerland, from which they flew to Toronto, Canada where they rented a car and drove to Detroit, Michigan from which they flew to Tampa, Florida. (Id., pp. 24–43);

That she had no recollection of receiving checks from Candor in a sum greater than $1,000, but that it was possible and that she had no source of income other than from Candor; that she had no recollection of making sizable deposits to her personal checking account but that all deposits to her checking account were made by her. (Id., pp. 44–60).

At the conclusion of the preliminary injunction hearing on November 4th, Margolies was served with a subpoena pursuant to Bankruptcy Rule 205. This examination was adjourned by agreement of counsel to December 3, 1981. On that date, Margolies refused to answer any questions, asserting her privilege against self-incrimination. Counsel to Margolies has indicated that the same response would be made to all questions in the course of the 205 examination and this adversary proceeding. The preliminary injunction hearing and the Rule 205 examination were adjourned *sine die* pending a resolution by the court of the issues arising out of the assertion of the privilege against self-incrimination by Margolies.

Margolies asserts that she has not waived her privilege not to testify by testifying at an earlier stage of the hearing, because she made no incriminating statements at the prior hearing, and requiring her to testify again would expose her to a real risk of incrimination. Alternatively, Mrs. Margolies contends that if her statements at the earlier hearing are considered incriminating by this court, she may still not be compelled to testify because to do so would expose her to a risk of further incrimination.

The issues before this court are whether Margolies has waived her Fifth Amendment privilege; whether, in the context of a Bankruptcy Rule 205 examination, Margolies can assert a blanket privilege against self-incrimination, and furthermore, whether certain questions can be asked of Margolies as to which the privilege against self-incrimination cannot be asserted.

The bellweather case in the area of waiver of the Fifth Amendment privilege is *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1956) ("*Brown*"). In that case, a witness who had voluntari-

ly[1] taken the stand to testify[2] was later precluded from invoking the Fifth Amendment privilege even though her prior statements were not incriminating. A witness must weigh the advantage of the privilege against the advantage of putting forward his version of the facts and his reliability as a witness.

■ "The concepts of voluntariness and compulsion under Fifth Amendment analysis have very little to do with the race to the courthouse door. A witness in any case, civil or criminal, witness or party, who has available to him the right to assert the privilege against self-incrimination and refuses to invoke it before testifying waives the privilege and is denominated a voluntary witness."[3] Margolies' November 1981 affidavit,[4] offered in opposition to Maguire's motion for a preliminary injunction, was a voluntary offer of Margolies' version of the facts in the underlying litigation and would ordinarily constitute a waiver of her Fifth Amendment privilege.

■ Similarly, the privilege ordinarily would have been forfeited as to the details of Margolies' testimony offered at the November 4, 1981 preliminary injunction hearing (the "hearing"). A witness who testifies to certain transactions can be compelled to testify further because "[d]isclosure of a fact waives the privilege as to details." *Rogers v. United States*, 340 U.S. 367, 373, 71 S.Ct. 438, 442, 95 L.Ed. 344, *reh. denied* 341 U.S. 912, 71 S.Ct. 619, 95 L.Ed. 1348 (1951) ("*Rogers*"). Supplying details of facts already disclosed presents no danger of further incrimination.

Although *Rogers* has been oft cited for the so-called "further incrimination" test upholding the privilege as against testimonial waiver, the Second Circuit has refused to apply strictly the "further incrimination" test. "[S]trict application of [that] test would limit testimonial waiver to situations where the witness' earlier statement has proven his or her guilt beyond a reasonable doubt .... The court does not believe that the Rogers Court intended such a result." *Hutton, supra*, at 115–116.

The *Hutton* approach, which stressed an alternative rationale to the "further incrimination" test propounded by the *Rogers* court, was endorsed by a recent Second Circuit case, *Klein v. Harris*, 667 F.2d 274 (2d Cir. 1981) ("*Klein*"). According to *Klein*, prior Supreme Court and Second Circuit decisions permit the inference of a waiver of the privilege if

"(1) the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) the witness had reason to know that his prior statements would be interpreted as a waiver of the fifth amendment's privilege against self-incrimination." *Klein* at 287.

The court justified the inference of a waiver under these circumstances in the following fashion.

"Where a witness has made statements that were both 'testimonial' and 'incriminating,' as those terms are defined above, he has made statements that, by virtue of

1. Margolies relies on *Arndstein v. McCarthy*, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138 (1920), to support her claim of privilege. However, that case is distinguishable from both *Brown* and the instant proceeding based, *inter alia*, on the involuntary nature of the testimony therein elicited.

2. An affidavit voluntarily submitted and addressed to the merits of the litigation is no less testimonial than the testimony of the witness in *Brown. See, E. F. Hutton & Co. v. Jupiter Development Corp.*, 91 F.R.D. 110, 117 (S.D.N.Y.1981) ("*Hutton*"), *citing Camelot Group, Ltd. v. W. A. Krueger Co.*, 486 F.Supp. 1221, 1229–30 (S.D.N.Y.1980).

3. *Sigety v. Abrams*, 492 F.Supp. 1123, 1134–35 (S.D.N.Y.1980), *rev'd on other grounds* 632 F.2d 969 (2d Cir. 1981).

4. The critical affidavit for purposes of determining the within application is the November 3, 1981 affidavit of Madeleine Margolies. The defendant's memoranda, either erroneously or in an attempt to obfuscate the issues, repeatedly refers to Margolies' attorney's affidavit, which document has no bearing on the within issue except to the extent that it makes reference to Margolies' affidavit.

their 'testimonial' nature, will likely influence the finder of fact, and that, by virtue of their 'incriminating' nature, contain information that the witness was privileged not to reveal. Thus, any witness who makes testimonial, incriminating statements plainly has reason to know, when he does so, that these statements may be interpreted as a waiver of his fifth amendment privilege against self-incrimination. Such a witness certainly is not treated unfairly, then, if a court ultimately interprets the statements in this fashion." *Id.* 288.

In the instant case, Margolies' affidavit and testimony at the hearing were both "testimonial" and "incriminating" as those terms are defined in *Hutton*.[5] Margolies made certain statements voluntarily,[6] under oath in the context of a judicial proceeding which increased her chances of criminal prosecution or conviction. Margolies testified as to:

(1) the purchase of real estate for $150,000 when she had no financial resources to repay any loan for that purchase;

(2) her relationship with Candor Diamond Corp., the functions she performed there, and the manner in which they were executed;

(3) her sources and amount of her income;

(4) the records of her financial affairs and the manner in which they were kept;

(5) the trip she took with her husband in 1981;

(6) the procurement of a loan for $180,000.

Any one of these statements directly inculpates Margolies and all are, at the very least, "potential links in the chain of evidence" needed to prosecute her. *Hutton, supra,* 117 at n. 2. Therefore, since Margolies has already testified to incriminating[7] matters which could aid in her subsequent prosecution, she has seemingly forfeited her Fifth Amendment privilege as to those matters as well as to the details of facts already disclosed.

However, according to the first of the two-pronged test enunciated in *Klein*[8], to lose the Fifth Amendment privilege a witness' prior incriminating testimonial statements must be likely to influence the finder of fact and open the way to distortion due to the untested and incomplete nature of such statements.

In the instant case, the incriminating testimonial statements which Maguire argues form the predicate for waiver of Margolies' Fifth Amendment privilege are contained in Margolies' affidavit submitted in support of her cross-motion to vacate her default in the underlying adversary proceeding and in her testimony at the hearing. Since that cross-motion has been denied by this court, and Maguire's motion to enter the default judgment has been granted by decision dated June 11, 1982, even if the affidavit and testimony presented a distorted view of the facts, no prejudice could inhere to Maguire since this court has not relied on either the Margolies affidavit or testimony.[9] Therefore, the Margolies affidavit and testimony cannot form the predicate for waiver of Margolies' privilege against self-incrimination.

The finding that Margolies has not waived her Fifth Amendment privilege in the instant proceeding does not mean that she can blanketly refuse to testify at a Bankruptcy Rule 205 examination. As to

---

5. *Hutton, supra,* at 114.

6. *See,* text of opinion, *supra,* at 8.

7. As noted, *supra,* fn. 2, Margolies' reliance on the *Arndstein* decisions, *Arndstein v. McCarthy,* 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138, *reh. denied,* 254 U.S. 379, 41 S.Ct. 136, 65 L.Ed. 314 (1920) and later appealed *McCarthy v. Arndstein,* 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023 (1923) *adhered to* 266 U.S. 34, 45 S.Ct. 16, 69

L.Ed. 158 (1924), is misplaced. Those decisions concerned prior involuntary non-incriminating testimony.

8. The *Klein* test is a reiteration of the alternative of two rationales propounded by the *Rogers* court upon which the Second Circuit has indicated its intent to rely.

9. *Hutton, supra* at 117.

each question propounded to her, Margolies must establish a proper basis for invoking the privilege.[10] Those questions concerning transactions beyond any applicable statute of limitations [11] or requiring the production of books and records kept in a representative rather than personal capacity are clearly without the scope of the privilege against self-incrimination. Corporate books and records cannot be the subject of the personal privilege even though production might tend to incriminate Margolies personally.[12] *United States v. White*, 322 U.S. 694, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (1944).

Thus, while Margolies has not waived her Fifth Amendment privilege as a result of this court's discretion to enter a default judgment against her in the underlying adversary proceeding, she has no right to assert a blanket privilege as to questions propounded to her at a separate stage of the proceedings against Candor.

---

**10.** *United States v. Zappola*, 646 F.2d 48, 53 (2d Cir. 1981).

**11.** *Brown v. Walker*, 161 U.S. 591, 598, 16 S.Ct. 644, 647, 40 L.Ed. 819 (1896).

**12.** Pursuant to a Bankruptcy Rule 205 subpoena, Margolies has previously been directed to produce certain corporate records of Candor.